**SHAKESPEARE COMPANY, Plaintiff,**

v.

**SILSTAR CORPORATION OF AMERICA, INC., Defendant.**

Civ. A. No. 3:90–1695–19.

United States District Court, D. South Carolina, Columbia Division.

Sept. 24, 1992.

**1388**

Frank Rogers Ellerbe, III, and James M. Brailsford, III, Robinson, McFadden & Moore, Columbia, S.C., for plaintiff.

William C. Cleveland, Haynsworth, Marion, McKay & Guerard, Charleston, S.C., for defendant.

## MEMORANDUM OPINION AND ORDER

SHEDD, District Judge.

Shakespeare Company ("Shakespeare"), a manufacturer and distributor of fishing rods, is the owner of a federally registered trademark for fishing rods consisting of a whitish-translucent, or clear, tip portion of the rod, combined with an opaque rod base. Shakespeare uses this mark on a variety of types of rods it markets under its "Ugly Stik" line of rods. Shakespeare commenced this action to enjoin Silstar Corporation of America, Inc.'s ("Silstar") attempt to market a fishing rod known as the "Silstar Power Tip Crystal" rod, which has a color configuration similar to that covered by Shakespeare's trademark. Shakespeare

asserts three claims for relief: trademark infringement under Section 32(1) of the Lanham Trademark Act of 1946 ("the Lanham Act"), 15 U.S.C. § 1114(1); unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); and common law trademark infringement and unfair competition.

Silstar asserts in defense that its use of the clear tip is a fair use and that Shakespeare is precluded from enforcing any rights under the registered trademark based on the doctrine of unclean hands. Silstar has also filed a counterclaim seeking damages and cancellation of Shakespeare's mark, in which it contends that Shakespeare's mark is invalid because the clear tip is both a functional feature and generic of the type of fishing rods at issue, and because the clear tip mark simply consists of two contrasting colors. Silstar further contends that Shakespeare, by allowing third-party manufacturers to sell customized rods on its clear-tipped rod blanks, has not only misrepresented the source of some clear-tipped rods, but has also destroyed any secondary meaning which the mark may have had.

By Order dated October 5, 1990, then District Judge (now Circuit Judge) Clyde H. Hamilton, to whom this case had been assigned, granted Shakespeare's motion for a preliminary injunction, finding that Shakespeare was likely to succeed on its trademark infringement claim. Judge Hamilton enjoined Silstar from "distributing, marketing, advertising, promoting, holding for sale, or selling" either the Silstar Power Tip Crystal rod or any rod bearing or using any colorable imitation or confusingly similar facsimile of Shakespeare's clear-tip rod trademark during the pendency of this action. Judge Hamilton also required Shakespeare to post bond in the amount of $25,000 as security for the payment of costs and damages that Silstar may incur or suffer in the event that the injunction is later determined to have been erroneously issued. *See Fed.R.Civ.P.* 65(c).

The Court tried this case without a jury on March 19–20, 1992. After thoroughly reviewing the record and carefully considering the controlling legal principles, the Court concludes that Silstar's use of the clear tip is a fair use and, therefore, Silstar is entitled to prevail on Shakespeare's claims. The Court further concludes that the clear tip is a functional feature of the fishing rods involved in this case. In light of this latter conclusion, the Court will order the Commissioner of the Patent and Trademark Office ("PTO") to cancel Shakespeare's trademark.

## I. FINDINGS OF FACT

Based on the evidence presented at trial,[1] the Court makes the following findings of fact [2] pursuant to Rule 52(a) of the Federal Rules of Civil Procedure:

1. Shakespeare is a Delaware corporation with its principal place of business in Columbia, South Carolina. Shakespeare manufactures, distributes and sells fishing tackle equipment, including fishing rods.

2. Since 1976, Shakespeare, as part of its Ugly Stik line of rods, has manufactured, advertised, distributed, and sold rods with a whitish-translucent, or clear, tip and an opaque base. Shakespeare is the owner of United States Trademark Registration number 1,261,786, which is registered on the Principal Register. Shakespeare's trademark provides in pertinent part:

> [Shakespeare] claims no proprietary right in the configuration of the fishing rod itself as a trademark when it lacks the whitish, translucent tip portion fea-

---

1. Shakespeare presented five witnesses, either in person or by way of deposition, and introduced 96 exhibits into evidence. Silstar presented four witnesses and introduced 41 exhibits into evidence. Several of the exhibits consist of multiple articles or documents. The majority of the exhibits were introduced without objection and many of the facts purportedly shown in the exhibits were stipulated to be undisputed.

2. To the extent that any of the following findings of fact more properly constitutes a conclusion of law, it shall be deemed as such. Likewise, to the extent that any conclusion of law more properly constitutes a finding of fact, it shall be so deemed.

ture. The mark is used by applying it to the goods in that the mark is the color configuration of the fishing rod as shown in the drawing in which the tip portion of the shaft between the tip and the second line guide elements consists of a whitish, translucent material in contrast to the opaque remainder of the shaft. This trademark is the subject of this lawsuit.

3. Shakespeare has sold millions of Ugly Stik rods, making the Ugly Stik its biggest selling and most profitable line of rods. Shakespeare sells Ugly Stiks for freshwater and saltwater use, with freshwater rods comprising approximately 85–90% of Shakespeare's annual sales. The large majority of freshwater Ugly Stiks have clear tips, while most saltwater Ugly Stiks do not. Approximately 80–90% of all Ugly Stiks have clear tips. The length of the clear tip on these rods varies depending on the type of action for which the rod is designed. In many instances, the clear tip extends above or below the second line guide.

4. Silstar is a South Carolina corporation with its principal place of business in Lexington, South Carolina. Silstar is owned by Silver Star, a Korean corporation that manufactures fishing rods. Silstar sells rods manufactured by Silver Star in competition with Shakespeare.

5. Until the late 1940s, fishing rods were made primarily of steel or bamboo; however, during that period, fiberglass rods were introduced into the market. For many years thereafter, fiberglass was the primary material from which fishing rods were made. Fiberglass rods consisted of two types: solid and hollow. The advantage of solid fiberglass rods was their strength. The disadvantage was their expense and weight. Hollow fiberglass rods were less expensive and lighter than solid fiberglass rods, but they were also less durable since they tended to break more easily, especially at the tip, which is the most vulnerable part of the rod. The fiber-

glass rods were predominantly white in color.

6. Shakespeare was one of the first companies that developed a process for making a hollow fiberglass rod with a solid fiberglass tip. This process is called the "Howald process"[3] and involves essentially two steps: first, a fiberglass cloth is wrapped around a steel mandrel to form the hollow core of the rod; and second, longitudinal fiberglass fibers are placed along the length of the rod and extended beyond the hollow core, thereby forming a solid fiberglass tip.

7. The Howald process produced a white, hollow fiberglass tube with a white, solid fiberglass tip. The Howald process rods had solid fiberglass tips very similar to the Ugly Stik, except for the color, and were a vast improvement over entirely hollow fiberglass rods; however, they still suffered from being weaker than solid fiberglass rods.

8. The Howald process was the subject of various patents. Because of the protection afforded by these patents, which have now expired, Shakespeare was for many years one of the only manufacturers to offer hollow rods with solid fiberglass tips.

9. The Ugly Stik rods which bear Shakespeare's trademark are made of a hollow graphite tube and a solid fiberglass tip. The process of making this type of rod was developed by Monroe Lindler, a former engineer for Shakespeare, and is the subject of the Lindler U.S. Patent No. 4,061,-806, which was issued on December 6, 1977. Lindler's development of the process for manufacturing Ugly Stik rods is the result of his adaptation of the Howald process.

10. At the time that Lindler developed his process, graphite was expensive; however, Lindler experimented with it because of its extreme strength and lightness. After unsuccessfully trying several different graphite combinations, Lindler used graphite in the Howald process and the result

---

**3.** Shakespeare actually uses the term "Howald process" to refer to separate processes developed by Arthur Howald and Arthur Scott.

was a rod which was significantly stronger than Shakespeare's rods at that time. The use of graphite substantially improves the strength of the rods compared to fiberglass rods, while still maintaining the light weight which is desirable to fishermen.

11. Prior to the development of the Ugly Stik, neither Shakespeare nor any other rod distributor manufactured or sold rods with a clear fiberglass tip.

12. Shakespeare sold the Ugly Stik with the natural appearance which resulted from the manufacturing process for approximately one year. The graphite base was charcoal gray, which is the natural color of graphite and the tip was whitish-translucent, or clear, which is the natural color of the fiberglass and resin combination used by Lindler.

13. The natural color of resin, which is the liquid component which subsequently becomes solid and holds the rod together, depends on the type of curing agents and chemicals used; it is not necessarily clear.

14. In manufacturing rods, there are only two types of fiberglass which may be used: polyester resin compatible fiberglass or epoxy resin compatible fiberglass. Prior to the Ugly Stik, Shakespeare used polyester resin compatible fiberglass, the natural unpigmented color of which is a whitish-frosty (not clear) color. For the Ugly Stik, Shakespeare used epoxy resin compatible fiberglass because this is the best fiberglass and resin for use with graphite in the manufacturing process. Shakespeare did not add or subtract any pigment to the resin and did not intentionally design the process to create a clear tip.

15. The index of light refraction through the specific resin and fiberglass fiber used by Shakespeare for the Ugly Stik causes the tip to be clear. The clear tip is the natural appearance of the combination of fiberglass and the resin most suited for use on the rod.

16. After manufacturing and selling the Ugly Stik for one year, Shakespeare's sales department objected to the appearance of the unpigmented rods because it was not absolutely uniform. Instead, some rods had frosty streaks on the base which could not be controlled in the manufacturing process. In an effort to increase the aesthetics of the Ugly Stik, Shakespeare added a resin bath in the manufacturing process to pigment the fibers used for the rod base. However, Shakespeare did not pigment the tip.

17. Shakespeare recognized from the first Ugly Stik that it was stronger than other hollow rods because it has graphite instead of fiberglass in the first layer of material. Shakespeare felt that the Ugly Stik was superior to other rods because it was light yet resisted breaking at the tip.

18. Because the Ugly Stik rods with the clear resin were strong and had a distinctive appearance compared to other rods, Shakespeare deliberately chose to market the rods with that appearance so that consumers could see and identify the unique appearance of the rod and recognize the enhanced features of the graphite base and the solid fiberglass tip. The appearance of the enhanced features derived from the natural colors of the materials used.

19. The color of a rod or tip has no bearing on how a rod performs. However, there is clearly an advantage in communicating to consumers the fact that a rod is made of graphite with a solid fiberglass tip, and the best method of communicating this fact is by marketing the rod with the clear tip and opaque base. Coloring the rod or the tip obscures the fact that the rod is made out of graphite and has a solid fiberglass tip.

20. It is cheaper to produce rods with clear tips than to produce rods with colored tips.

21. Shakespeare first sought to register as a trademark the clear tip color configuration for its rods with the PTO on May 5, 1978, when it filed an application for trademark registration.

22. On January 19, 1979, the PTO refused Shakespeare's request for registration on the Principal Register stating that the mark "appears to be in the nature of an ornamental design and, as such, does not serve the purpose of indicating origin of the goods in [Shakespeare]." The PTO in-

dicated that if Shakespeare "contends that its design does function as a mark, this application will be further considered upon receipt of evidence showing that the design has been promoted as a trademark and that it is recognized as an indication of the origin of applicant's goods."

23. On June 5, 1979, Shakespeare responded to the PTO by submitting evidence that the color configuration had been promoted as a trademark in numerous publications. Shakespeare also submitted the affidavits of seven buyers and owners of sporting goods stores in which the affiants stated essentially that they were familiar with various brands and types of fishing rods and that they felt the clear tip of Shakespeare's rods were distinctive and made the rods easily and "automatically" identifiable as those of Shakespeare.

24. The PTO responded on April 9, 1980, by informing Shakespeare that the mark was capable of registration under Section 2(f) of the Lanham Act (15 U.S.C. § 1052(f)). The PTO requested that Shakespeare seek registration under this section and instructed Shakespeare to "state that its mark has become distinctive as supported by a separate showing."

25. Shakespeare amended its application on May 15, 1980, in accordance with the PTO's instruction.

26. On June 17, 1980, the PTO placed Shakespeare's mark on the Supplemental Register and designated it Registration Number 1,137,112. Thereafter, on August 15, 1981, the PTO advised Shakespeare that its claim of distinctiveness was "substantively acceptable" and instructed Shakespeare to have a corporate officer verify the claim.

27. In reply, Shakespeare, on September 15, 1981, submitted the affidavit of Bert Rost, then Vice President of Shakespeare, in which he stated that he believed Shakespeare to be the owner of the mark it sought to register, that to his knowledge no one else had the right to use the mark in identical form or in a form likely to cause confusion or deceive, and that "the mark [had] become distinctive of [Shakespeare's] goods, as evidenced by the showing submit-

ted separately during prosecution of the subject Application."

28. On December 22, 1981, the PTO issued notice of publication of Shakespeare's requested mark in the Official Gazette, and on December 20, 1983, the PTO granted Shakespeare's application and placed its mark on the Principal Register.

29. Shakespeare's trademark became incontestable under the provisions of 15 U.S.C. § 1065 on November 13, 1989.

30. In 1988, Shakespeare filed suit against Silstar in this district alleging causes of action similar to those alleged in the present lawsuit in response to Silstar's display of the "Silstar Power Tip" rod, a rod with a clear tip and an opaque base, at the 1988 annual trade show of the American Fishing Tackle Manufacturers Association ("AFTMA"). *See Shakespeare Co. v. Silstar Corp. of Am.*, C.A. No. 3:88–1995–15. Shakespeare later voluntarily dismissed that lawsuit after Silstar agreed to change the clear tip on the Power Tip rod to a painted red-translucent tip. Silstar continues to sell the Power Tip rod with a red-translucent tip. Silstar reserved its right, however, to attempt to sell rods with clear tips in the future.

31. This action arose after Shakespeare became aware that Silstar had advertised and offered for sale a line of 12 fishing rods known as the Silstar Power Tip Crystal rods in the July 1990 issue of *Fishing Tackle Retailer*. The Power Tip Crystal rods which were advertised by Silstar have a color configuration for the rod tip and base similar to Shakespeare's mark.

32. Other than the similarity between the color configurations of the rod base and tip, the Power Tip Crystal and Ugly Stik rods differ significantly in appearance. For example, Shakespeare uses silver colored line guides, a silver colored extreme tip portion, and red and yellow diamond wrap at the base of the rod above the handle. In contrast, Silstar uses gold colored line guides, a gold colored extreme tip portion, and no wrap at the base of the rod. Moreover, the handles differ significantly in shape (cylindrical vs. tapered) and the

reel sets differ in color (black vs. gold). Finally, Shakespeare places its Ugly Stik logo in prominent white letters on its rods, while Silstar's lower tip Crystal logo appears in gold letters with a red background.

33. There is more than one method of manufacturing a graphite-fiberglass composite fishing rod with a clear tip. In fact, Silver Star manufactures the Power Tip Crystal rods for Silstar using a manufacturing method that differs from the Lindler method. The Lindler method has a cutting mechanism that allows the longitudinal fiberglass fibers to be cut at different intervals so that the number of fibers may differ on the base and the tip of the rod. In contrast, the Silver Star method does not have any cutting mechanism; therefore, the number of fibers is consistent on the entire rod. Given this fact, Silver Star cannot produce a rod which has different colored fibers on the base and the tip.

34. Silstar was aware of Shakespeare's trademark rights when it introduced the Power Tip Crystal rod and it recognized that Shakespeare might have considered the Power Tip Crystal to be an infringement of the registered mark.

35. Silstar desires to use the clear tip on the Power Tip Crystal rods in order that consumers can see and understand the qualities the rod possesses. Silstar does not seek to use the clear tip as a source of origin of the rods.

36. Shakespeare has devoted the large majority of its advertising budget since 1976 to the Ugly Stik, advertising the rods on nationally televised programs such as "ABC's Wide World of Sports," "American Sportsman," "Fishing With Roland Martin," "Al Lindler's Fishing Specials," and "Outdoor Life;" and in nationally and regionally circulated publications such as *Field & Stream, Popular Mechanics,* and *Sports Afield.* Shakespeare has also distributed annually approximately 100,000–250,000 catalogues per year consisting of trade catalogues, which are distributed by sales representatives at trade shows, and consumer catalogues, which are distributed to consumers in stores and at various shows.

37. While the nature of these advertisements varies, Shakespeare has repeatedly advertised and promoted the fact that the clear fiberglass tip is unique, is the result of an exclusive patented process, and imparts strength, flexibility, and sensitivity to the rod which cannot be achieved through any other process.

38. Several former Shakespeare employees are now employed by Silstar. For example, Mr. Rost, the General Manager of Silstar Germany, is the former President of Shakespeare. Mark Skrocki, Silstar's Director of Sales and Marketing, is a former Advertising Manager for Shakespeare. Other former Shakespeare employees who now work for Silstar include Joe Bart, a former Shakespeare Vice President who is now involved with Silstar's operations in Holland; Jimmy Cato, a former Shakespeare employee who is now President of Silstar; Mike Bell, who is now Silstar's Director of Promotions Planning and Development; Chris Kopacz, who is an Accounts Payable Manager for Silstar; and Calvin Lucus, who is a Shipping Clerk for Silstar.

39. At the time that Mr. Rost was employed by Shakespeare, he approved the sale of manufacturing equipment used by Shakespeare in its Hong Kong plant to Silver Star. Although Silver Star could not manufacture the Power Tip Crystal rod with this machinery, it did get the technology to do so from these machines.

## II. CONCLUSIONS OF LAW

In light of the foregoing findings of fact, the Court makes the following conclusions of law pursuant to *Fed.R.Civ.P.* 52(a):

1. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1338(a) and (b), 15 U.S.C. § 1121, and pendent jurisdiction. Venue is properly laid in this division under 28 U.S.C. § 1391.

2. "[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *University of Tex. v.*

*Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981).

■ 3. Shakespeare's first, and primary, cause of action is for trademark infringement under 15 U.S.C. § 1114(1), which provides in pertinent part:

Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ...

shall be liable in a civil action by the registrant for the remedies hereinafter provided.

In order to prevail on a claim under this section, Shakespeare must establish: (1) the trademark is valid and legally protectable, (2) it owns the trademark, and (3) Silstar's use of the trademark is likely to create confusion concerning the origin of the goods that the marks purport to identify. *Ford Motor Co. v. Summit Motor Prods., Inc.,* 930 F.2d 277, 291 (3d Cir.), *cert. denied sub nom. Altran Corp. v. Ford Motor Co.,* — U.S. ——, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991).

■ 4. Shakespeare's mark is registered on the Principal Register. Under 15 U.S.C. § 1115(a), the registration of a mark registered on the principal register

[S]hall be admissible in evidence and shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration subject to any conditions or limitations stated therein, but shall not preclude another person from proving any legal or equitable defense or defect, including those set forth

in [15 U.S.C. § 1115(b)], which might have been asserted if such mark had not been registered.

The registration creates a presumption of validity of the mark and of the owner's exclusive right to its use, *Pizzeria Uno Corp. v. Temple,* 747 F.2d 1522, 1529 (4th Cir.1984); and the plaintiff in an infringement case, by introducing the registration, is presumed to have established the first two elements of its case. *See Brittingham v. Jenkins,* 914 F.2d 447, 453 (4th Cir.1990). The burden of proof is then shifted from the plaintiff, who in a common law infringement action would have had to establish his right to exclusive use, to the defendant, who may rebut the presumption by a preponderance of the evidence. *Pizzeria Uno Corp.,* 747 F.2d at 1529 & n. 4.

■ 5. The presumption which registration gives a mark does not preclude one charged with infringement from collaterally attacking the registration by way of affirmative defense or counterclaim seeking cancellation if the mark has not become incontestable. *Pizzeria Uno Corp.,* 747 F.2d at 1529.

6. If the owner of a registered mark uses the mark continuously for five consecutive years and satisfies certain other formalities, then its right to use the mark is deemed incontestable. 15 U.S.C. § 1065. Incontestability is one of the most significant advantages of registration because once a mark becomes incontestable, "the registration [is] conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce" subject to certain defenses specified in the Lanham Act. 15 U.S.C. § 1115(b).[4] Proof of incontestability, subject to the Lanham Act defenses, is conclusive proof of the first two elements of a claim for trademark infringement. *Ford Motor Co.,* 930 F.2d at 291.

---

**4.** As Justice Stevens noted in his dissent in *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 206 & n. 1, 105 S.Ct. 658, 667 & n. 1, 83 L.Ed.2d 582 (1985), the term "incontestable" is

"somewhat confusing and misleading" because there are over 20 situations in which infringement of an incontestable mark is permitted under the Lanham Act.

7. Shakespeare's mark is incontestable subject to the Lanham Act defenses and, unless Silstar can establish one of these defenses, Shakespeare has conclusively established the validity of the mark and its right to use the mark.

8. Silstar seeks to destroy the incontestable status of Shakespeare's mark by asserting that its use of the clear tip on the Power Tip Crystal rod is a fair use of a descriptive device. Fair use is a defense to trademark infringement even where, as here, the trademark has become otherwise incontestable. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 12 (2d Cir.1976).

9. The "fair use" defense allows one charged with infringement to prove

That the use of the name, term, or device charged to be an infringement is a use, otherwise as a mark, ... of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party....

15 U.S.C. § 1115(b)(4). The analytical focus of the defense is on how the party charged with infringement uses the mark. *Ideal Indus., Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1027 (7th Cir.1979), *cert. denied*, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980).

10. The fair use defense "in essence, forbids a trademark registrant to appropriate a descriptive [device] for his exclusive use and so prevent others from accurately describing a characteristic of their goods." *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1185 (5th Cir.1980), *cert. denied*, 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981). It is based on the recognition that "[d]escriptive devices are unsuited to the function of marks both because they are poor means of distinguishing one source of [goods] from another and because they are often necessary to the description of all goods ... of a similar nature." *M.B.H. Enters., Inc. v. WOKY, Inc.*, 633 F.2d 50, 54 (7th Cir.1980). "When a plaintiff has chosen a mark with some descriptive qualities, he cannot altogether exclude some kinds of competing uses even when the mark is properly on the register...." *Abercrombie & Fitch Co.*, 537 F.2d at 12.

11. To prevail on its fair use defense Silstar must prove that (1) the clear tip is a descriptive device, (2) its use of the clear tip is not as a trademark but is merely descriptive, and (3) it is using the clear tip fairly and in good faith. *Dayton Progress Corp. v. Lane Punch Corp.*, 917 F.2d 836, 840 (4th Cir.1990).

12. As a preliminary matter, the Court must determine whether the fair use defense is applicable to a mark such as Shakespeare's which consists of a color configuration. In granting the preliminary injunction, Judge Hamilton noted that the fair use defense "applies most easily to word trademarks" and questioned whether the defense has any applicability to this case, since Shakespeare's mark is not a word mark. *See* Oct. 15, 1990, Order, at 13–14. Silstar argues that the fair use defense is applicable because the statute does not limit the defense to word marks but, instead, expressly allows for the fair use of a "name, term, or device." Because 15 U.S.C. § 1115(b)(4) does provide for the fair use of a descriptive device, the Court must determine whether Shakespeare's mark (the color configuration) is a device.

13. The Lanham Act defines the term "trademark" as including "any word, name, symbol, or device, or any combination thereof ... used by a person ... to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127. Although "color" is not included in the definition of "trademark," it is clear that a color configuration, such as Shakespeare's mark, can serve as a valid trademark. *Transportation, Inc. v. Mayflower Servs., Inc.*, 769 F.2d 952, 955 (4th Cir.1985). While the term "device" is not defined in the Lanham Act, it is generally defined in relevant context as being "[a] decorative design, figure, or pattern," *The American Heritage Dictionary*, p. 389 (2d ed. 1991); or a "distinguishing mark or sign of any kind," *Black's Law Dictionary*, p. 452 (6th

ed. 1990). In light of this, it is apparent that a color configuration constitutes a "device" for purposes of the Lanham Act. *Cf.* W.J. Keating, *Development Of Evidence To Support Color–Based Trademarks,* 9 J.L. & Com. 1, 8 (1989) ("arguably color could qualify as . . . a 'device' " under the Lanham Act). Accordingly, Silstar may assert the fair use defense against Shakespeare's claim of infringement.

 14. The fair use defense is applicable only in actions involving a descriptive mark. *Zatarains v. Oak Grove Smokehouse, Inc.,* 698 F.2d 786, 791 (5th Cir.1983). A mark is descriptive if it " 'imparts information directly' " or " 'identifies a characteristic or quality of an article.' " *Pizzeria Uno Corp.,* 747 F.2d at 1528 (citations omitted). Shakespeare's mark is unquestionably descriptive since the clear tip, in combination with the opaque rod base, signifies to consumers that the rod is composed of a graphite base with a solid fiberglass tip, both of which are features that are positive characteristics of fishing rods.[5] That is precisely the reason that Shakespeare chose the mark in the first place.

 15. In addition, the fair use defense is applicable only if Silstar is using the mark in its descriptive sense rather than as a trademark. *Zatarains,* 698 F.2d at 791. While the clear tip is the predominant feature of the Ugly Stik and Power Tip Crystal rods, this fact does not defeat the fair use defense since emphasis of a descriptive mark does not show that the mark is being used as a trademark. *Eli*

*Lilly & Co. v. Revlon, Inc.,* 577 F.Supp. 477, 486 (S.D.N.Y.1983). It is evident that Silstar does not seek to use the clear tip on the Power Tip Crystal rod in a trademark sense, that is "to identify and distinguish" the Power Tip Crystal rod from those manufactured or sold by others or "to indicate the source" of the Power Tip Crystal. 15 U.S.C. § 1127. Instead, whatever attention is drawn to the clear tip on the Power Tip Crystal rod serves merely to inform a prospective purchaser of the components and attributes of the rod. As one court has observed, "[v]irtually every aspect of a product's trade dress is intended to catch the eye of the purchaser. Unless attention is drawn to the particular [mark] as being indicative of source or origin of that product, the [mark] is not being used as a trademark." *Schmid Labs. v. Youngs Drug Prods. Corp.,* 482 F.Supp. 14, 20–21 (D.N.J.1979).

 16. Finally, the fair use defense is applicable only if Silstar is using the mark fairly and in good faith. Silstar seeks to use the clear tip only in its descriptive sense and the evidence establishes that the clear tip is without question the most effective means to market the rods in this descriptive sense. There is no indication that Silstar's attempt to utilize the clear tip is unfair or in bad faith.[6]

 17. Because Silstar has proven its fair use defense, it is entitled to prevail on Shakespeare's federal trademark infringe-

---

5. " '[A] mark which is merely descriptive is considered to be weak and cannot be accorded trademark protection without proof of secondary meaning. . . .' " *Pizzeria Uno Corp.,* 747 F.2d at 1527 (citation omitted). "Secondary meaning is used generally to indicate that a mark . . . 'has come through use to be uniquely associated with a specific source.' " *Two Pesos, Inc. v. Taco Cabana, Inc.* [—— U.S. ——, n. 4], 112 S.Ct. 2753, 2756 n. 4 [120 L.Ed.2d 615], (1992) (citation omitted). The Court notes that the PTO registered Shakespeare's trademark under 15 U.S.C. § 1052(f) only after Shakespeare demonstrated that the clear tip had acquired distinctiveness. This leads to a presumption that the mark has secondary meaning. *Boden Prods., Inc. v. Doric Foods Corp.,* 552 F.Supp. 493, 498 (N.D.Ill.1982). However, even though Shakespeare's mark has presumptively acquired sec-

ondary meaning, the fair use defense may be asserted since Shakespeare has no legal claim to an exclusive right in the primary, descriptive meaning of the mark. *Zatarains,* 698 F.2d at 791.

6. Shakespeare seeks to establish Silstar's alleged bad faith by asserting that Silstar employs several former Shakespeare employees, Silstar's rods are produced with machinery sold to Silver Star by Mr. Rost while he worked for Shakespeare, and Silstar was aware of Shakespeare's mark when it placed the mark on the Power Tip Crystal rod. While each of these facts are supported by the record, they do not support the inference of bad faith which Shakespeare advances.

ment claim and it may use the mark on its rods.[7]

18. As noted, Silstar not only seeks the right to use the mark, it also seeks to cancel Shakespeare's registration. While the fair use defense does not invalidate Shakespeare's mark but, instead, simply grants Silstar the right to use the mark fairly and in good faith on its rods, the defense does reduce the evidentiary status of the registration to *prima facie* rather than conclusive evidence of Shakespeare's right to exclusive use of the mark. *Park 'N Fly, Inc.*, 469 U.S. at 199 n. 6, 105 S.Ct. at 664 n. 6. In other words, because Silstar has proven its fair use defense, the registration now has the same evidentiary value that it had during the five-year period of continuous use preceding the point in time in which it became incontestable. F.T. Mahaney, *Incontestability: The Park 'N Fly Decision*, 33 U.C.L.A. L.Rev. 1149, 1168 (1986); *see Louis Rich, Inc. v. Horace W. Longacre, Inc.*, 423 F.Supp. 1327, 1339 (E.D.Pa.1976) ("the effect of § 1115(b) is simply to remove the statutorily created 'conclusive evidence' feature of the registration of an incontestable mark, relegating the owner of the mark to the normal burden of proving the validity of its mark and its right to the exclusive use of it").

19. Because the fair use defense has destroyed the incontestable status of the registration, Silstar may now assert any legal or equitable defense or defect which it might have asserted against the mark had the mark not been registered. 15 U.S.C. § 1115(a). In seeking to cancel the registration, Silstar contends that the mark is merely a functional feature of graphite based fishing rods with solid fiberglass tips and, accordingly, is not entitled

to trademark registration. The Court agrees.[8]

20. "Trademark law does not protect the functional features of products because such protection would provide a perpetual monopoly of features which could not be patented." *Esercizio v. Roberts*, 944 F.2d 1235, 1246 (6th Cir.1991), *cert. denied sub nom., Roberts v. Ferrari S.P.A. Esercizio Fabriche Automobili Corse*, —— U.S. ——, 112 S.Ct. 3028, 120 L.Ed.2d 899 (1992). The "key policy served by barring the use of functional features for identification is the policy favoring competition, and ... the 'functionality' inquiry must be addressed in light of this policy." *United States Golf Ass'n v. St. Andrews Sys., Data–Max, Inc.*, 749 F.2d 1028, 1033 (3d Cir.1984). Hence, a mark which is merely a functional feature of a good is not entitled to registration or protection under the Lanham Act, *International Order of Job's Daughters v. Lindeburg & Co.*, 727 F.2d 1087, 1091 (Fed.Cir. 1984); and "functional features which are not the subject of a valid patent or copyright may be imitated with impunity." *Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.*, 626 F.2d 193, 195 (1st Cir. 1980).

21. Silstar bears the burden of proving functionality. *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 520 (10th Cir.1987).

22. While the functionality of a product feature "cannot be determined by application of a mechanical test," *United States Golf Ass'n*, 749 F.2d at 1033; a product feature is generally considered functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article," *Inwood Labs., Inc. v. Ives*

---

7. The fair use defense is applicable even where a plaintiff can establish likelihood of confusion since "[t]o hold otherwise would effectively viscerate the fair-use defense." *Soweco, Inc.*, 617 F.2d at 1189 n. 30. Accordingly, the Court need not reach the issue of whether the clear tip on the Power Tip Crystal will create a likelihood of confusion.

8. Functionality, which is not listed as a defense to an incontestable mark under 15 U.S.C. § 1115(b), is applicable only because Silstar has proven its fair use defense under 15 U.S.C.

§ 1115(b)(4). *See Park 'N Fly*, 469 U.S. at 193–205, 105 S.Ct. at 661–67 (the Supreme Court recognized that the Lanham Act limits "the power of the courts to cancel registrations and 'to otherwise rectify the register' ... to the specific provisions concerning incontestability," and held that a "holder of a registered mark may rely on incontestability to enjoin infringement and that such an action may not be defended on ... grounds" not provided for in the Lanham Act).

*Labs., Inc.,* 456 U.S. 844, 851 n. 10, 102 S.Ct. 2182, 2187 n. 10, 72 L.Ed.2d 606 (1982); or "if 'it something that other producers of the product in question would have to have as part of the product in order to be able to compete effectively in the market.' " *Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 20 (7th Cir.1992) (citation omitted).

23. The availability of alternative designs is a key factor in determining functionality. *Hartford House, Ltd. v. Hallmark Cards, Inc.,* 846 F.2d 1268, 1273 (10th Cir.), *cert. denied,* 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988). A design is functional "if it is one of only a limited number of efficient options available to competitors." *Sunbeam Corp. v. Equity Indus. Corp.,* 635 F.Supp. 625, 636 (E.D.Va.1986).

24. Functionality is not limited to product features which are essential to the operation of the product. *Brunswick Corp.,* 832 F.2d at 519. Thus, the color of a product may be functional. *See, e.g., Warner Lambert Co. v. McCrory's Corp.,* 718 F.Supp. 389, 396 (D.N.J.1989); *cf. Coca–Cola Co. v. Dixi–Cola Labs., Inc.,* 155 F.2d 59, 65 (4th Cir.1946) ("The color of the drink ... is functional").

25. In this case, there is no alternative design to Shakespeare's mark which would be as effective in communicating to consumers the fact that the rod is made of a graphite base and a solid fiberglass tip since the clear tip and the opaque base represent the natural colors of the graphite and fiberglass resin which compose the rod. To allow Shakespeare to have a perpetual monopoly on the color configuration would unquestionably hinder competition since it would preclude all competitors from using the natural and most effective means of marketing their products, and would require them to use a less effective and more costly method.[9] This hindrance to competition would ultimately result in a detriment to consumers. Accordingly, Shakespeare's mark is a functional feature of graphite fishing rods which have a solid fiberglass tip.[10]

26. In any action involving a registered mark,

> [T]he court may determine the right to registration, order the cancelation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action. Decrees and orders shall be certified by the court to the Commissioner, who shall make appropriate entry upon the records of the Patent and Trademark Office, and shall be controlled thereby.

15 U.S.C. § 1119.

27. The legal issue in a cancellation proceeding is the right to register a mark and when a mark is not incontestable, a court may cancel the mark on any ground which would have prevented registration initially. *International Order of Job's Daughters,* 727 F.2d at 1091.

28. As noted, a mark "which does not fulfill the functions of a trademark, but, rather, serves essentially a utilitarian or functional purpose cannot be registered as a trademark." *Id.; see Goodyear Tire & Rubber Co. v. Robertson,* 25 F.2d 833, 834–35 (4th Cir.1928) (holding that diamond-shaped tread on tire, "which is a mechanically functional feature of an automobile tire," cannot be registered).

29. Because Shakespeare's mark is a functional feature of graphite rods with solid fiberglass tips, the mark is not the

---

**9.** This case is very similar to another case involving Shakespeare. In *In re Shakespeare Co.,* 289 F.2d 506 (C.C.P.A.1961), the Court of Customs and Patent Appeals held that certain markings on Shakespeare's "Wonderod" which necessarily resulted from the Howald process were not registrable as a trademark notwithstanding the fact that the markings had acquired secondary meaning. The court stated: "[w]ere the spiral marking to be treated as a trademark the holder of the trademark rights would have a

potentially perpetual monopoly which would enable it either to prevent others from using the process which results in the mark or force them to go to the trouble and expense of removing it." 289 F.2d at 508.

**10.** Because the fair use defense has destroyed the incontestable status of Shakespeare's mark, functionality is also a defense to Shakespeare's Lanham Act infringement claim.

subject of a registrable trademark. Accordingly, the Court shall order the Commissioner of the PTO to cancel the mark from the register.

30. Shakespeare's second cause of action is for unfair competition under 15 U.S.C. § 1125(a), which provides in pertinent part:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person

. . . . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Because Shakespeare's claim for unfair competition hinges on Silstar's alleged trademark infringement, this claim must fail based on the Court's conclusions concerning functionality and fair use. *See Two Pesos, Inc.,* — U.S. at —, 112 S.Ct. at 2758 ("It is ... clear that eligibility for protection under [15 U.S.C. § 1125] depends on nonfunctionality"); *Robert B. Vance & Assocs. v. Baronet Corp.,* 487 F.Supp. 790, 797 (N.D.Ga.1979) (" 'fair use' defense defeats a claim not only for trademark infringement, but also precludes a recovery under 15 U.S.C. § 1125(a) for federal unfair competition"). Accordingly, Shakespeare is not entitled to prevail on this claim.

31. Shakespeare's final cause of action is for common law trademark infringement and unfair competition. The elements of trademark infringement and unfair competition under South Carolina common law

are identical to the elements for those claims under the Lanham Act. *See Pizzeria Uno Corp. v. Temple,* 566 F.Supp. 385, 399 (D.S.C.1983), *aff'd,* 747 F.2d 1522 (4th Cir.1984); *Taylor v. Hoppin' Johns, Inc.,* 304 S.C. 471, 405 S.E.2d 410, 413 (1991). Accordingly, the Court concludes that Shakespeare has failed to establish its cause of action for common law trademark infringement and unfair competition.

### III. ORDER

Based on the foregoing, the Court hereby ORDERS that the preliminary injunction issued on October 5, 1990, be DISSOLVED and that judgment be ENTERED in favor of Silstar on all causes of action.[11] The Court further ORDERS the Commissioner of the Patent and Trademark Office to CANCEL United States Trademark Registration number 1,261,786 from the Principal Register based on grounds of functionality. The Clerk of Court is DIRECTED to certify a copy of this Opinion and Order to the Commissioner. The Court will retain limited jurisdiction of this matter for the disposition of Shakespeare's bond.

IT IS SO ORDERED.

---

11. In view of the Court's holding concerning the fair use and functionality defenses, it is unnec-essary for the Court to reach the other issues raised by the parties.