**SHAKESPEARE COMPANY,**
Plaintiff–Appellant,

v.

**SILSTAR CORPORATION OF AMERICA, INCORPORATED,**
Defendant–Appellee.

No. 92–2311.

United States Court of Appeals,
Fourth Circuit.

Argued March 31, 1993.

Decided Nov. 15, 1993.

---

N/A

Jack Lewis Renner, Renner, Kenner, Greive, Bobak, Taylor & Weber, Akron, OH, argued (Reese Taylor, Sylvia Petrosky, Renner, Kenner, Greive, Bobak, Taylor & Weber, Akron, OH; James M. Brailsford, III, Frank R. Ellerbe, III, Robinson, McFadden & Moore, Columbia, SC, on the brief), for plaintiff-appellant.

Francis Morris Pinckney, Shefte, Pinckney & Sawyer, Charlotte, NC, argued (William C. Cleveland, Haynsworth, Marion, McKay & Guerard, Charleston, SC, on the brief), for defendant-appellee.

Before WIDENER and NIEMEYER, Circuit Judges, and CHAPMAN, Senior Circuit Judge.

## OPINION

CHAPMAN, Senior Circuit Judge:

■ This appeal presents an issue of first impression for this court: whether a district court considering cancellation, pursuant to § 37 of the Lanham Act (15 U.S.C. § 1119 (1988)), of a trademark that has been registered more than five years, and is incontestable pursuant to 15 U.S.C. § 1065 (1988), can order cancellation on the ground that the trademark is found to be functional, even though functionality is not one of the grounds set forth in 15 U.S.C. § 1064. We hold that Congress adopted 15 U.S.C. § 1119 to give the district court power concurrent with, but not in excess of, the Patent and Trademark Review Board and that the district court is also limited by the language of the statutes controlling the Board. We therefore hold that the district court improperly canceled the registration on the ground of functionality because functionality is not one of the statutorily enumerated grounds upon which a trademark registered more than five years may be canceled.

### FACTS

Shakespeare, a manufacturer of fishing rods, is located in Columbia, S.C. In 1976 Shakespeare inaugurated its immensely successful line of "Ugly Stik" fishing rods for both salt and fresh water fishing. About 80–90% of these rods, as well as some of Shakespeare's other rods, feature a section of solid fiberglass near the tip which appears clear or translucent. The "clear tip," as Shakespeare calls it, is the subject of this litigation.

The clear tip rods are manufactured in a two-stage process, which was perfected in the 1970's. First, a fiberglass cloth is wrapped around a hollow graphite tube. Second, fiberglass fibers are stretched lengthwise from the handle of the rod to the tip. Some of these fibers extend beyond the end of the graphite tube and form the solid fiberglass tip. This composition represented the culmination of a series of techniques developed by Shakespeare and it resulted in a superior rod that is both lightweight and very strong.

Before Shakespeare began production of the clear tip it had used polyester resin compatible fiberglass in its fishing rods. This type of fiberglass naturally solidifies into a whitish-frosty (not clear) color. In producing the clear tip rods, however, Shakespeare began to use epoxy resin compatible fiberglass because they found it to be the most compatible for use with the graphite tube. This second type of fiberglass solidifies naturally into a clear or translucent color. The Ugly Stiks, and other Shakespeare rods using epoxy resin compatible fiberglass, therefore, feature a clear or translucent tip and a darker-colored rod.

On May 5, 1978 Shakespeare filed for registration of Trademark Registration number 1,261,786. That registration states:

[Shakespeare] claims no proprietary right in the configuration of the fishing rod itself as a trademark when it lacks the whitish, translucent tip portion feature. The mark is used by applying it to the goods in that

the mark is the color configuration of the fishing rod as shown in the drawing in which the tip portion of the shaft between the tip and the second line guide elements consists of a whitish, translucent material in contrast to the opaque remainder of the shaft.

J.A. at 544.

Initially, the request for registration of the clear tip as a trademark was denied by the United States Patent and Trademark Office ("PTO"), which reasoned that the "mark appears to be in the nature of an ornamental design and, as such, does not serve the purpose of indicating origin of the goods in applicant." The PTO offered Shakespeare the opportunity to submit evidence that the clear tip was viewed in the marketplace as an indication that Shakespeare was the source of the rod. Shakespeare submitted copies of advertisements and catalogs as evidence that the clear tip had been promoted as a trademark of the company. It also submitted seven identical affidavits of buyers and retailers who testified that the clear tip "automatically" identified the rods as coming from Shakespeare.

The trademark was placed on the Principal Register on December 20, 1983.

On November 13, 1989, after it had been on the register for five years and other conditions had been satisfied, the trademark became "incontestable" pursuant to 15 U.S.C. § 1065 (1988).[1] Incontestability is "conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the mark in commerce." 15 U.S.C. § 1115(b) (1988).

In July 1990 Silstar Corporation ("Silstar"), a Korean-owned manufacturer of fishing rods, with its principal place of business in Lexington, South Carolina, introduced a line of fishing rods called the Silstar Power Tip Crystal rods. Shakespeare representatives testified they first became aware of this line through Silstar's advertisement in the July 1990 issue of Fishing Tackle Retailer.

The Silstar rods featured a color combination, with a clear fiberglass section, similar to that of the Shakespeare clear-tip line.

Shakespeare instituted this action July 20, 1990 in the United States District Court for the District of South Carolina, Columbia Division. It asserted three claims against Silstar: trademark infringement under Section 32(1) of the Lanham Trademark Act of 1946 ("the Lanham Act"), 15 U.S.C. § 1114(1) (1988); unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (West 1982 & Supp.1993); and common law trademark infringement and unfair competition.

Silstar answered and defended on the grounds that its use of the clear tip was a "fair use" under § 1115(b)(4). Silstar also counter-claimed seeking cancellation of Shakespeare's trademark on the grounds that the mark was both functional and generic.

On July 20, 1990 Shakespeare also filed a motion for a temporary restraining order and for a preliminary injunction against Silstar's distribution of the Power Tip Crystal rods. These motions were heard by then District Judge Clyde H. Hamilton, who found the motion for TRO moot but granted Shakespeare a preliminary injunction.

After a bench trial March 19–20, 1992, 802 F.Supp. 1386, before Judge Dennis Shedd, the court dissolved the preliminary injunction, ruled in favor of Silstar on each of Shakespeare's claims, and canceled Shakespeare's trade-mark on the clear tip.

The District Court's reasoning may be summarized as follows: that there was no dispute that Shakespeare's trademark on the clear tip had become "incontestable" pursuant to § 1065; that such status was conclusive evidence of Shakespeare's ownership of the trademark and its right to control it, pursuant to § 1115(b); that Silstar could defend by proving that its use of the mark was a fair use because the mark was merely descriptive of its product; that Silstar's use

---

1. § 15 the Trademark Act of 1946 (Lanham Act), 60 Stat. 427, as amended, 15 U.S.C. § 1051 et seq. (1988). Citations to the sections of the Lanham Act have been deleted. All statutes cited can be found in the Lanham Act, Title 15 U.S.C. § 1051 et seq. (1988).

of the clear tip was a fair use because the court found the clear tip was merely descriptive of the contents of the product, namely fiberglass; that Silstar was not using the clear tip as a trademark or in bad faith; and that this determination rendered the trademark merely *prima facie* evidence of Shakespeare's right to own and control the clear tip. The court then found Silstar was entitled to raise equitable defenses to the infringement action under § 1115(a).

The court held that an element of a product that is functional is not subject to trademark protection, and that fiberglass was selected to compose the tip because it is the strongest, most practical material for the tip of a fishing rod. It found the clear tip to be functional because its very appearance communicates to the consumer that it is composed of fiberglass. Finding the clear tip to be functional and not intended to communicate a brand of origin, the district court concluded that it was required to cancel the trademark.

The district court's determination that there was no trademark infringement resulted in the dismissal of the dependent statutory claim for unfair competition, and the common law claims for trademark infringement and unfair competition.

## I.

 The issue is whether a district court, pursuant to its power under § 1119, can cancel the registration of a trademark on grounds not enumerated in § 1064, namely "functionality," if the registration is more than five years old.

## A.

Federal trademark protection was overhauled and consolidated with the passage of the Trademark Act of 1946 (Lanham Act), 60 Stat. 427, as amended, 15 U.S.C. § 1051 (1988), *et seq.* It was adopted to establish consistent nationwide protection for trademarks by creating a system of registration, by instituting safeguards for those trademarks registered for a period of time, and by setting forth an administrative process for infringement actions. *Park 'N' Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 193, 105 S.Ct. 658, 661, 83 L.Ed.2d 582 (1985).

As previously noted, Shakespeare's trademark on the clear tip was placed on the principal register in 1983, and by the time of this lawsuit it had achieved incontestable status, pursuant to 15 U.S.C. § 1065. A registered trademark becomes incontestable after it has been registered and in continuous use for five years and meets four other requirements.[2]

Incontestability conferred on the registration is conclusive evidence of its validity and of Shakespeare's ownership of and exclusive right to use the trademark. 15 U.S.C. § 1115(b).[3] This section states that the con-

---

**2.** That provision requires:

(1) there has been no final decision adverse to registrant's claim of ownership of such mark for such goods or services, or to registrant's right to register the same or to keep the same on the register; and

(2) there is no proceeding involving said rights pending in the Patent and Trademark Office or in a court and not finally disposed of; and

(3) an affidavit is filed with the Commissioner within one year after the expiration of any such five-year period setting forth those goods or services stated in the registration on or in connection with which such mark has been in continuous use for such five consecutive years and is still in use in commerce and the other matters specified in paragraphs (1) and (2) of this section; and

(4) no incontestable right shall be acquired in a mark which is the generic name of the goods or services or a portion thereof, for which it is registered.

15 U.S.C. § 1065.

**3.** § 1115(b) states:

(b) Incontestability; defenses

To the extent that the right to use the registered mark has become incontestable under section 1065 of this title, the registration shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce. Such conclusive evidence shall relate to the exclusive right to use the mark on or in connection with the goods or services specified in the affidavit filed under the provisions of section 1065 of this title, or in the renewal application filed under the provisions of section 1059 of this title if the goods or services specified in the renewal are fewer in number, subject to any conditions or limitations in the registration or in such affidavit or renewal application. Such conclusive evidence of the right to use the registered mark

clusive evidence is subject to certain defenses: "... equitable principles, including laches, estoppel, and acquiescence are applicable." *Id.* "If one of the defenses is established, registration constitutes only prima facie and not conclusive evidence of the owner's right to exclusive use of the mark." *Park 'N'*

shall be subject to proof of infringement as defined in section 1114 of this title, and shall be subject to the following defenses or defects:

(1) That the registration or the incontestable right to use the mark was obtained fraudulently; or

(2) That the mark has been abandoned by the registrant; or

(3) That the registered mark is being used, by or with the permission of the registrant or a person in privity with the registrant, so as to misrepresent the source of the goods or services on or in connection with which the mark is used; or

(4) That the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, of the party's individual name in his own business, or of the individual name of anyone in privity with such party, or of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin; or

(5) That the mark whose use by a party is charged as an infringement was adopted without knowledge of the registrant's prior use and has been continuously used by such party or those in privity with him from a date prior to (A) the date of constructive use of the mark established pursuant to section 1057(c) of this title, (B) the registration of the mark under this chapter if the application for registration is filed before the effective date of the Trademark Law Revision Act of 1988, or (C) publication of the registered mark under subsection (c) of section 1062 of this title: Provided, however, That this defense or defect shall apply only for the area in which such continuous prior use is proved; or

(6) That the mark whose use is charged as an infringement was registered and used prior to the registration under this chapter or publication under subsection (c) of section 1062 of this title of the registered mark of the registrant, and not abandoned: Provided, however, That this defense or defect shall apply only for the area in which the mark was used prior to such registration or such publication of the registrant's mark; or

(7) That the mark has been or is being used to violate the antitrust laws of the United States; or

(8) That equitable principles, including laches, estoppel, and acquiescence, are applicable.

*Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 199 n. 6, 105 S.Ct. 658, 664 n. 6, 83 L.Ed.2d 582 (1985).

If a party attacking the validity of a registration seeks cancellation through the Trademark Trial and Appeal Board ("the Board") it is explicitly limited by §§ 1115 and 1064.[4]

15 U.S.C. § 1115(b).

4. 15 U.S.C. § 1064 states:

§ 1064 Cancellation of registration

A petition to cancel a registration of a mark, stating the grounds relied upon, may, upon payment of the prescribed fee, be filed as follows by any person who believes that he is or will be damaged by the registration of a mark on the principal register established by this chapter, or under the Act of March 3, 1881, or the Act of February 20, 1905:

(1) Within five years from the date of the registration of the mark under this chapter.

(2) Within five years from the date of publication under section 1062(c) of this title of a mark registered under the Act of March 3, 1881, or the Act of February 20, 1905.

(3) At any time if the registered mark becomes the generic name for the goods or services, or a portion thereof, for which it is registered, or has been abandoned, or its registration was obtained fraudulently or contrary to the provisions of section 1054 of this title or of subsection (a), (b), or (c) of section 1052 of this title for a registration under this chapter, or contrary to similar prohibitory provisions of such prior Acts for a registration under such Acts, or if the registered mark is being used by, or with the permission of, the registrant so as to misrepresent the source of the goods or services on or in connection with which the mark is used. If the registered mark becomes the generic name for less than all of the goods or services for which it is registered, a petition to cancel the registration for only those goods or services may be filed. A registered mark shall not be deemed to be the generic name of goods or services solely because such mark is also used as a name of or to identify a unique product or service. The primary significance of the registered mark to the relevant public rather than purchaser motivation shall be the test for determining whether the registered mark has become the generic name of goods or services on or in connection with which it has been used.

(4) At any time if the mark is registered under the Act of March 3, 1881, or the Act of February 20, 1905, and has not been published under the provisions of subsection (c) of section 1062 of this title.

(5) At any time in the case of a certification mark on the ground that the registrant (A) does not control, or is not able legitimately to exercise control over, the use of such mark or (B)

An administrative attack on a registered trademark more than five years after the date of publication of its initial registration, regardless of whether it is incontestable, may only be brought on grounds enumerated under 15 U.S.C. § 1064. *Id.* Therefore, § 1064 has been described as a kind of statute of limitations for actions seeking cancellation of marks registered for more than five years. 2 J. Thomas McCarthy *McCarthy on Trademarks and Unfair Competition* § 20.-15[1] at 20–91 (3rd Ed.1992).

In our case, however, Silstar sought cancellation in a responsive pleading in the district court, rather than through the Board. Pursuant to another provision of the Lanham Act, 15 U.S.C. § 1119, the district court is empowered to cancel registrations,[5] but § 1119 lists no grounds upon which a registration may be canceled and simply states the district "court may determine the right to registration...." This raises the issue of whether the district court's authority to cancel under § 1119 is circumscribed by the same limitations that restrain the Board in an administrative cancellation proceeding.

### B.

This is a novel question and we have not found a case that squarely addresses this precise issue. However, the Supreme Court has given some guidance in the only case in which it has discussed § 1119, *Park 'N' Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985). Though the central issue in *Park 'N' Fly* differs from that of the case at bar, we consider it to be analogous and therefore worthy of consideration.

In *Park 'N' Fly* Petitioner operated, under the name, Park 'N' Fly, a chain of parking lots located in close proximity to airports in Cleveland, Houston, Boston, Memphis and San Francisco. 469 U.S. at 191, 105 S.Ct. at 660. Its trademarked name was registered and had attained incontestable status. *Id.* Respondent operated, under the name Dollar Park and Fly, parking services near the airport in Portland, Oregon. 469 U.S. at 192, 105 S.Ct. at 660. Petitioner brought this infringement action in the United States District Court for the District of Oregon, seeking to permanently enjoin respondent from use of the name Dollar Park and Fly. *Id.* In its response, respondent, *inter alia,* sought cancellation, pursuant to § 1119, of petitioner's trademark on two grounds: that it was a generic term and that it was merely descriptive. *Id.*

The district court found that the mark was not generic and that an incontestable mark was not susceptible to challenge on the basis of being merely descriptive. The court granted the permanent injunction against respondent's use of the phrase "Park and Fly." *Id.*

The U.S. Circuit Court of Appeals for the Ninth Circuit reversed, holding that incontestability cannot be used as an offensive weapon in an infringement action. *Park 'N' Fly, Inc. v. Dollar Park & Fly, Inc.,* 718 F.2d 327, 331 (9th Cir.1983). The court acknowledged its view was in direct conflict with that of the Seventh Circuit, as expressed in *Union Carbide Corp. v. Ever–Ready, Inc.,* 531 F.2d 366 (7th Cir.), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976). The circuit court held that in order to enjoin another's use of a trademark, the holder of even an incontestable mark must show that it would

engages in the production or marketing of any goods or services to which the certification mark is applied, or (C) permits the use of the certification mark for purposes other than to certify, or (D) discriminately refuses to certify or to continue to certify the goods or services of any person who maintains the standards or conditions which such mark certifies.
*Provided,* That the Federal Trade Commission may apply to cancel on the grounds specified in paragraphs (3) and (5) of this section any mark registered on the principal register established by this chapter, and the prescribed fee shall not be required.

**5.**

**Power of court over registration**
In any action involving a registered mark the court may determine the right to registration, order the cancellation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action. Decrees and orders shall be certified by the court to the Commissioner, who shall make appropriate entry upon the records of the Patent and Trademark Office, and shall be controlled thereby.
15 U.S.C. § 1119.

continue to qualify for registration. *Park 'N' Fly*, 718 F.2d at 331. After determining that petitioner's mark was merely descriptive, the circuit court held that petitioner's mark would not be entitled to continued registration but for its incontestable status. *Id.* The court held that "a party can defend against the effect of federal registration by a showing that would suffice to cancel the mark in question were it not incontestable." *Id.* The circuit court therefore affirmed the district court's decision not to cancel the mark but reversed its decision to enjoin respondent from use of the mark. 718 F.2d at 332.

On appeal the Supreme Court recognized the split in the circuits over whether incontestability can be used offensively. Writing for the majority, Justice O'Connor stated that the Lanham Act clearly reflected that Congress contemplated that incontestability would be invoked by a registrant in an infringement action. 469 U.S. at 196, 105 S.Ct. at 662.

> The incontestability provisions ... provide a means for the registrant to quiet title in the ownership of his mark.... This function of the incontestability provisions would be utterly frustrated if the holder of an incontestable mark could not enjoin infringement by others so long as they established that the mark would not be registrable but for its incontestable status.

469 U.S. at 198, 105 S.Ct. at 663.

The Court held that a district court, entertaining an action for cancellation of a mark, is obliged to consider the limits of the Lanham Act.

> [T]he power of the courts to cancel registrations and "to otherwise rectify the register," § 37, 15 U.S.C. § 1119, must be subject to the specific provisions concerning incontestability. In effect, both respondent and the dissent argue that these provisions offer insufficient protection against improper registration of a merely descriptive mark, and therefore the validity of petitioner's mark may be challenged notwithstanding its incontestable status. Our responsibility, however, is not to evaluate the wisdom of the legislative determinations reflected in the statute, but instead

to construe and apply the provisions that Congress enacted.

*Park 'N' Fly*, 469 U.S. at 203, 105 S.Ct. at 666.

■ If the power of the district court under § 1119 is implicitly constrained by the specific provisions of one subsection of the Lanham Act, § 1115(b), it is reasonable to conclude that it is limited by another related subsection, § 1064. The Court states that § 1064 does limit cancellation of a registration more than five years old, 469 U.S. at 197, 105 S.Ct. at 663, and this would be cancellation pursuant to § 1119 because the Court's inquiry was rooted in that context.

We are persuaded that the rationale enunciated by Justice O'Connor in *Park 'N' Fly* would apply so as to limit cancellation under § 1119 to the grounds set forth in § 1064. Functionality is not one of such grounds and it may not be used as a basis for cancellation of a registration more than five years old.

We have considered the possibility that functionality invalidates a trademark at any stage of the process, and that registration offers no protection whatsoever to an invalid mark that should never have been registered in the first place. This is the position taken by Justice Stevens in his dissent in *Park 'N' Fly*, 469 U.S. at 206, 105 S.Ct. at 667. Justice Stevens argued that mere descriptiveness, the quality at issue in that case, invalidated the registration, 469 U.S. at 206–07, 105 S.Ct. at 667–68, and that incontestability could not be used as a shield behind which an invalid mark could hide. 469 U.S. at 211, 105 S.Ct. at 670. We find these arguments unpersuasive.

Perhaps the provisions of the Lanham Act apply only to valid trademarks, and that a functional trademark is invalid, but it would seem anomalous for Congress to enumerate specific grounds for cancellation for a five-year-old registration, as it has done in § 1064, and not list functionality, if it intended functionality to serve as such a ground. As Justice O'Connor stated, "[o]ur responsibility ... is not to evaluate the wisdom of the legislative determinations reflected in the statute, but instead to construe and apply the

provisions that Congress enacted." 469 U.S. at 203, 105 S.Ct. at 666.

Prior to *Park 'N' Fly* the Eighth Circuit applied the same rule in *Wrist–Rocket Manufacturing Co. v. Saunders Archery Co.*, 516 F.2d 846, 852, (8th Cir.), *cert. denied,* 423 U.S. 870, 96 S.Ct. 134, 46 L.Ed.2d 100 (1975), and held that the district court was not empowered, under § 1119, to cancel an incontestable trademark on the ground that the original registration was obtained with false statements. 516 F.2d at 852. The court stated that the grounds for removing incontestable status are listed in § 1115(b). It also observed that one of the grounds listed in § 1115(b) is that the registration was obtained fraudulently. The court held that, although false statements were used, the registration was not made with the intent to defraud and was therefore not made fraudulently. In concluding that the district court canceled improperly, the court held the "specific language [of § 1115] limits the power of the District Court pursuant to ... § 1119." *Id.*

In another line of cases this court and others have suggested an inclination to limit § 1119 with § 1064 in discussions of the purpose of § 1119. In *Durox Co. v. Duron Paint Mfg. Co.*, 320 F.2d 882 (4th Cir.1963), we stated, "[t]he authority given by [§ 1119] to the courts over the respective rights of parties to trademark registrations is concurrent with the authority of the Patent office to conduct opposition and cancellation proceedings, and the remedies are not mutually exclusive." We explained that the purpose of § 1119 is to make it possible for trademark actions that include cancellation proceedings to be consolidated in the district court. More recently, the Third Circuit reiterated its position in a former case stating, "There the court said that proceedings in the patent office and [§ 1119] are concurrent remedies. We, of course, agree." *Ditri v. Coldwell Banker Residential Affiliates, Inc.*, 954 F.2d 869, 874 (3rd Cir.1992) (citing *Simmonds Aerocessories v. Elastic Stop Nut Corp.*, 257 F.2d 485 (3rd Cir.1958)).

### C.

Our conclusion that the power of cancellation given to the district court by § 1119 is limited by § 1064, has support among the commentators.

In his treatise *McCarthy on Trademarks and Unfair Competition,* J. Thomas McCarthy states:

> Some courts have held that the civil courts are bound by the same grounds for cancellation as is the Patent and Trademark Office. There has been doubt expressed whether a court, pursuant to its inherent equity power, has the right to order cancellation of a registration over five years old for some ground other than that specified in the Act. The Supreme Court has observed that the power of federal courts under [§ 1119] to cancel registrations "must be subject to the specific provisions concerning incontestability," which in turn incorporate the criteria of [§ 1064] by reference. By implication, this means that a court in litigation is bound by the grounds for cancellation in [§ 1064] (citing *Park 'N' Fly* ).

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 30.32[4] at 30–162 (3rd Ed.1992) (citations omitted).

The commentator Siegrun D. Kane states, "[t]here is some dispute as to whether the limits placed on Patent and Trademark Office cancellation proceedings also apply to court proceedings. A coherent reading of the statute suggests that the grounds for cancellation should be the same in both forums." Siegrun D. Kane, *Trademark Law* 281 (2d Ed.1991).

Jerome Gilson, author of *Trademark Protection and Practice,* expressed the following view:

> The broad grant of judicial power in [§ 1119] is not unlimited, however. First, the court is still required to exercise reasonable judicial discretion. Thus, a trial court was found to have abused its discretion when it failed to order cancellation of a trademark which it had found to be generic. Second, a court exercising its power under [§ 1119] is bound by the presumptions which accompany incontestability under [§ 1065].

Jerome Gilson, *Trademark Protection and Practice* § 4.10[2] at 4–63 (revised 1989).

In conclusion, we hold that the district court erred in canceling, pursuant to 15 U.S.C. § 1119, the trademark held by Shakespeare on the grounds that it is functional, because that is not an authorized ground for cancellation under 15 U.S.C. § 1064. Since no other ground enumerated under § 1064 was alleged by Silstar, the mark is valid as a matter of law. We therefore reverse the district court and remand the case for further consideration of Shakespeare's statutory and common law infringement and unfair competition claims. We further instruct the district court that any inquiry into an alleged "fair use" of the clear tip must be accompanied by an analysis of the likelihood of confusion among consumers that may be created by Silstar's use of the clear tip.

*REVERSED.*

NIEMEYER, Circuit Judge, dissenting:

While the majority treats this case as if it involved solely the cancellation of a trademark registration, I respectfully submit that such an analysis overlooks the antecedent issue of whether an enforceable trademark exists. Moreover, the question of whether Shakespeare's registration may be canceled is analytically distinct from the question of whether a defense to its enforcement exists, and the two are governed by different statutory provisions. The initial question, therefore, which is not addressed by the majority but which is dispositive of the case, is whether this court should enforce the trademark, not whether this court should cancel it (the relief prayed for in the counterclaim). When the doctrine of functionality, the full extent of which is not articulated in the majority's opinion, is applied, the judgment of the district court must be affirmed.

The doctrine of functionality is an extra-statutory doctrine, neither defined nor limited by the express provisions of the Lanham Trademark Act, which denies a perpetual monopoly of that which is functional. Despite the absence of a textual basis for this doctrine, it is integrated into the Act because of the presumption that Congress did not intend to upset the well-established principle that trademark protection is inapplicable to the functional. The doctrine of functionality is a public policy trump card that may be played against an otherwise valid trademark, not an element to be considered in determining a mark's validity. Even if every presumption is made in favor of the existence of a trademark—that the mark enables determination of source, that it distinguishes the relevant goods, and that it has secondary meaning—these factors will not allow a functional feature to be monopolized beyond the limits imposed by the law of patents in compliance with the Constitution. *See* U.S. Const., art. I, § 8, cl. 8 (empowering Congress to grant exclusive rights to inventions only for "limited times"). As is shown below, the law is properly summarized by texts that teach:

> Even if a functional feature has achieved consumer recognition (secondary meaning) of that feature as an indicia of origin, the feature cannot serve as a legally protectable symbol.

J. Thomas McCarthy, *Trademarks and Unfair Competition*, § 7.26 (3d ed. 1992).

Before discussing the nature of the doctrine of functionality, I must revert to the facts and the findings of the district court which place the case before us directly under the doctrine.

I

For years fishing rods have been made from fiberglass, both hollow and solid. Hollow fiberglass rods are lighter and less expensive than solid ones, but they also are more inclined to break, particularly at the tip. While solid rods are stronger, they are also heavier and more expensive than hollow ones. Shakespeare Company, one of the leading manufacturers of fishing rods, developed a process to make use of the benefits of each type of rod by combining a hollow fiberglass base with a solid fiberglass tip.

With the introduction of graphite in the mid–1970's, Shakespeare developed yet a stronger and lighter rod by using a hollow graphite base with a solid fiberglass tip, and it obtained a patent on the process of combining the graphite base with a fiberglass tip.

Consequently, for years only Shakespeare sold rods with hollow graphite bases and solid fiberglass tips. The natural color of the graphite was charcoal gray and that of the fiberglass was clear or a whitish translucence.

While Shakespeare was at first troubled by the lack of aesthetic value in the two-colored rod, with its acceptance by consumers Shakespeare sought to capitalize on its homely appearance, denominating it the "Ugly Stik."

Shakespeare applied to the Patent and Trademark Office for registration of marks for the name and the appearance of the rod. The Patent and Trademark Office granted both. The mark covering the appearance of the rod claims exclusive right to market a rod

> in which the tip portion of the shaft between the tip and the second line guide elements consists of a whitish, translucent material in contrast to the opaque remainder of the shaft.

United States Trademark Registration No. 1,261,786 (registered on the principal register). To enhance the appearance of the rod, Shakespeare added dye to darken the rod's gray base and made efforts to clarify the resin in the tip. These changes, however, are not material to the issues in this case, because Shakespeare's mark extends beyond rods so altered and through it Shakespeare seeks to preclude Silstar Corporation of America, Inc., a competing manufacturer of rods, from selling a rod with a hollow graphite base and a fiberglass tip—a rod in which both graphite and fiberglass materials have been left with their natural appearance.

With the expiration of Shakespeare's patent for the process of manufacturing a hollow graphite rod with a solid fiberglass tip, Silstar began manufacturing similar rods to obtain the same functional benefits. Silstar, however, used a method of manufacture different from that covered by Shakespeare's patent. Silstar contends it chose to leave the graphite and fiberglass materials with their natural appearance "in order that the consumer will understand and appreciate the qualities which the rod possesses and because it is the easiest, least expensive and most desirable method of making its rod."

When Silstar's rod first appeared under the name Silstar Power Tip Crystal rod, Shakespeare asserted that it owned a trademark in the appearance of a rod with a gray base and clear tip like Silstar's. Moreover, it noted that its mark had been published by the trademark office for over five years and had become incontestable under 15 U.S.C. § 1065. In response to Silstar's contention that Shakespeare could not claim a mark in the functional design of the rod, Shakespeare argued that once a mark becomes incontestable, it cannot be canceled by the court under 15 U.S.C. § 1119, because Congress did not provide an express exception to incontestability under 15 U.S.C. §§ 1065 & 1115, based on the fact that a mark is a functional design. The district court disagreed and ordered that the mark be canceled.

The facts which the district court found following trial and on which it based its opinion are critical because they are amply supported by the evidence in the record, and the majority opinion accepts them for the basis of its decision, as do I.

The district court found that after Shakespeare developed the process of manufacturing a hollow graphite rod with a solid fiberglass tip, it sold the rod for approximately one year with the natural appearance "which resulted from the manufacturing process." The base was charcoal gray, the natural color of graphite, and the tip was "whitish-translucent, or clear," which is the natural color of fiberglass. The court found that Shakespeare chose to market the rod with the two-color appearance so that "consumers could see and identify the unique appearance of the rod and recognize the enhanced features of the graphite base and the solid fiberglass tip. The appearance of the enhanced features derived from the natural colors of the materials used." While Shakespeare enhanced the natural colors, the mark it claims covers the materials with their natural appearance:

> The mark is used by applying it to the goods in that the mark is the color configuration of the fishing rod as shown in the drawing in which the tip portion of the shaft between the tip and the second line guide elements consists of a whitish, trans-

lucent material in contrast to the opaque remainder of the shaft.

The court found that the appearance described in the trademark was the natural appearance of the *functional features* of a graphite rod with a solid fiberglass tip and to alter this natural appearance would impose additional costs on a manufacturer. The court concluded about the Shakespeare mark:

> In this case there is no alternative design to Shakespeare's mark which would be as effective in communicating to consumers the fact that the rod is made of a graphite base and a solid fiberglass tip since the clear tip and opaque base represent the natural colors of the graphite and fiberglass resin which compose the rod. To allow Shakespeare to have a perpetual monopoly on the color configuration would unquestionably hinder competition since it would preclude all competitors from using the natural and most effective means of marketing their products, and would require them to use a less effective and more costly method.

The court found that Silstar's Power Tip Crystal rod, other than having the same color of the graphite base and fiberglass tip, was significantly different from Shakespeare's in appearance. It found that Silstar chose to leave the graphite and fiberglass in their original state in order that "consumers can see and understand the qualities the rod possesses." The court concluded similarly, "whatever attention is drawn to the clear tip on the [Silstar] Power Tip Crystal rod serves merely to inform a prospective purchaser of the components and attributes of the rod."

Having found that Shakespeare's mark is nothing more than the manifestation of its functional features and therefore not subject to registration, i.e. it is nothing more than the natural appearance of functional materials used in their most inexpensively displayed state, the district court ordered the Commissioner of Patents and Trademarks to cancel Shakespeare's mark for the two-colored rod.

**II**

Preservation of the freedom to copy functional features is the issue in this case. This freedom has constitutional, statutory, and common law underpinnings. It is this freedom which the doctrine of functionality embodies.

Perhaps the most forceful and analytically complete statement of the doctrine of functionality is found in *In re Deister Concentrator Co.*, 289 F.2d 496 (C.C.P.A.1961). In *Deister*, the Court of Customs and Patent Appeals refused registration of a rhombohedral coal sorting table because the court found the shape to be dictated by functional concerns. The court noted that while the table's rhombohedral shape may well have acquired secondary meaning with the public,

> what appellant fails to take into account is that as to some words and shapes the courts will never apply the "secondary meaning" doctrine so as to create monopoly rights. The true basis of such holdings is not that they cannot or do not indicate source to the purchasing public but that there is an overriding public policy of preventing their monopolization, of preserving the public right to copy. A certain amount of purchaser confusion may even be tolerated in order to give the public the advantages of free competition.

> \* \* \* \* \* \*

> It seems to us that this case perfectly exemplifies what we mean by a functional or utilitarian shape which is incapable of acquiring a legally recognizable "secondary meaning" or of becoming an enforceable trademark for the simple reason that, absent patent protection, the public has the right to copy the shape and enjoy its advantages. Under no circumstances can it be accorded the legal protection to which trademarks are entitled. This being so, there is no need to consider the extensive efforts made by the use of what appellant calls advertising "gimmicks" featuring "rhomboidal" shapes or otherwise, to turn this outline shape of the goods, per se, into

a registrable mark. It has attempted the impossible.

289 F.2d at 505.

The Court of Customs and Patent Appeals later succinctly and forcefully restated its holding in *Deister* as follows:

> In our Deister opinion we pointed out that, in line with consistent decisions of the United States Supreme Court and other courts, nothing which the public has or would have a right to copy, in the absence of valid patent or copyright protection, can be the subject of a valid trademark registration and that this is so irrespective of public acceptance of the subject matter sought to be registered as an indication of source. We pointed out that this is a fundamental principle of the law of trademark ownership which is outside the provisions of the trademark statute (the Lanham Act), to which the provisions of that statute are subservient. We also pointed out that the principle applies without regard to the effort or money expended in an attempt to create trademark rights in something which the public has or will have the right to copy.

*In re Pollak Steel Co.,* 314 F.2d 566, 567 (C.C.P.A.1963).

The successor to the Court of Customs and Patent Appeals, the Federal Circuit, has made clear that the functionality defense is based on the vindication of the public's right to copy and is brought into play only after the elements of trademark ownership have been established. In *Black & Decker, Inc. v. Hoover Service Center,* 886 F.2d 1285 (Fed. Cir.1989), the court laid out some basic principles related to the functionality defense while vacating a clearly erroneous finding that the shape of a hand-held vacuum's bowl was functional:

> The Court of Appeals for the Second Circuit, whose law we apply to a denial of an injunction against trademark infringement in that Circuit, has stated that the accused infringer bears the burden of establishing the functionality defense, a defense created to insure its right to compete effectively by adopting the configuration claimed as a trademark. Thus the defense arises out of public policy and only after plaintiff has shown a basis for claiming a trademark right in the configuration. When upheld, the defense turns the balance against the risk of consumer confusion and in favor of competition by permitting others to use the configuration when, because of its functionality, they must do so to compete efficiently and thus effectively. That result has been stated as "functional features cannot be trademarks." *See* J. McCarthy, *Trademarks and Unfair Competition* § 7:26 (2d ed. 1984).
>
> *Proof that a configuration of goods is functional in the legal sense is a complete defense to establishment of a trademark right* that a plaintiff would otherwise have in that configuration.

*Black & Decker,* 886 F.2d at 1291 (emphasis added; some citations omitted); *see also In re Morton–Norwich Products, Inc.,* 671 F.2d 1332, 1336–37 (C.C.P.A.1982) (trademarks for product designs are limited to "nonfunctional" features); *In re Water Gremlin Co.,* 635 F.2d 841, 843–44 (C.C.P.A.1980) (same).

The Third Circuit has also set out the rationale for the doctrine of functionality at some length, in the context of denying trade dress protection to a roofing seam found functional:

> To allow indefinite trademark protection of product innovations would frustrate the purpose of the limited duration of patents to foster competition by allowing innovations to enter the public domain after seventeen years. As the United States Supreme Court stated nearly a century ago:
>
>> It is self evident that on the expiration of a patent the monopoly created by it ceases to exist, and the right to make the thing formerly covered by the patent becomes public property. It is upon this condition that the patent is granted. It follows, as a matter of course, that on the termination of the patent there passes to the public the right to make the machine in the form in which it was constructed during the patent.

*Singer Mfg. Co. v. June Mfg. Co.,* 163 U.S. 169, 185, 16 S.Ct. 1002, 1008, 41 L.Ed. 118 (1896).

*Merchant & Evans, Inc. v. Roosevelt Bldg. Products Co.,* 963 F.2d 628, 633–34 (3d Cir. 1992).

While the doctrine of functionality facilitates the copying of functional ideas, behavior which might appear to some to be unattractive, copying furthers competition that is key to our chosen economic system, a system which does not leave room only for conduct that is genteel. Indeed, the Supreme Court has observed that the limited time periods given to patentees by the Constitution and our patent laws create "a federal right to copy and to use." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 165, 109 S.Ct. 971, 985, 103 L.Ed.2d 118 (1989). Judge Medina once reflected on the harshness of our system's practice of allowing copying of that which is in the public domain, even when such copying results in one party benefiting from the labor of another:

> [A]t first glance it might seem intolerable that one manufacturer should be allowed to sponge on another by pirating the product of years of invention and development without license or recompense and reap the fruits sown by another. Morally and ethically such practices strike a discordant note. It cuts across the grain of justice to permit an intruder to profit not only by the efforts of another but at his expense as well.

> But this initial response to the problem has been curbed in deference to the greater public good. For imitation is the life blood of competition. It is the unimpeded availability of substantially equivalent units that permits the normal operation of supply and demand to yield the fair price society must pay for a given commodity. Unless such duplication is permitted, competition may be unduly curtailed with the possible resultant development of undesirable monopolistic conditions. The Congress, realizing such possibilities, has therefore confined and limited the rewards of originality to those situations and circumstances comprehended by our patent, copyright, and trade-mark laws. When these statutory frameworks are inapplicable, originality per se remains unprotected and often unrewarded. For these reasons and with these limitations the bare imita-

tion of another's product, without more, is permissible. And this is true regardless of the fact that the courts have little sympathy for a wilful imitator.

*American Safety Table Co. v. Schreiber,* 269 F.2d 255, 271–72 (2d Cir.), *cert. denied,* 361 U.S. 915, 80 S.Ct. 259, 4 L.Ed.2d 185 (1959).

The doctrine of functionality is well established and has long been applied, drawing its strength from constitutional underpinnings. Article I, section 8, clause 8 of the U.S. Constitution empowers Congress, "To Promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." This formulation, stressing the limited time for which rights in discoveries are to be secured, was a direct response to the long history of British grants of private monopolies. The doctrine of functionality furthers this constitutional value, as well as conforming trademark law to Congress' statutory scheme set forth to govern patents. As the Supreme Court has explained, patent law has three goals:

> First, patent law seeks to foster and reward invention; second, it promotes disclosure of inventions to stimulate further innovation and to permit the public to practice the invention once the patent expires; third, the stringent requirements for patent protection seek to assure that ideas in the public domain remain there for the free use of the public.

*Aronson v. Quick Point Pencil Co.,* 440 U.S. 257, 262, 99 S.Ct. 1096, 1099, 59 L.Ed.2d 296 (1979). Two of these—the preservation of free use of functional ideas in the public domain and the passage of technology to the public sphere upon a patent's expiration—are potentially at odds with trademark law. Only through strict observation of the doctrine of functionality may the courts avoid frustration of the congressional policies underlying patent law, which provides for the passage of utilitarian product features into the public realm within a set time frame. Patent law was intended by Congress to be the sole source of protection for functional features. The three other areas of intellectu-

al property law—trademark, copyright, and design patent—share the basic policy of the functionality doctrine: that the public interest in free competition prohibits functional or utilitarian product features from achieving protection beyond that offered by the patent laws. 1 Jerome Gilson, *Trademark Protection and Practice* § 2.14 (1993).

Three major Supreme Court cases have articulated the constitutional policy of denying *perpetual* protection to functional innovations, *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), *Compco Corp. v. Day–Brite Lighting, Inc.,* 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964), and *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989). In each of these cases the Court invalidated state-created grants of perpetual protection to functional designs under state unfair competition law, holding such grants inconsistent with the Supremacy Clause because of the manifested congressional intent to limit protection of such inventions to those protections provided in the patent law. Although the *Sears–Compco–Bonito Boats* trilogy does not directly control this case, it stands for the general principle that there is a strong federal policy against granting perpetual private rights in functional designs. In passing the Lanham Act, Congress intended neither to repudiate this policy nor to disturb the traditional exclusion from trademark protection of functional features.

Guidance in the inquiry into the bounds of the functionality doctrine is found in the fundamental theory underlying trademark protection. The presumption is that everyone has the right to use expressions, though Congress may grant a monopoly over particular usages to encourage trade. *In re Deister Concentrator Co.,* 289 F.2d 496, 501–02 (C.C.P.A.1961). The fundamental goals of the Lanham Act are in no way compromised by its recognition of the doctrine of functionality. Those goals are explicitly stated by the Act:

> The intent of this Act is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations.

15 U.S.C.A. § 1127. These goals were restated by the Supreme Court in *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985):

> The Lanham Act provides national protection of trademarks in order to secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers. See S.Rep. No. 1333, at 3, 5. National protection of trademarks is desirable, Congress concluded, because trademarks foster competition and the maintenance of quality by securing to the producer the benefits of good reputation. *Id.,* at 4.

469 U.S. at 198, 105 S.Ct. at 663.

The incontestability rights created by the Lanham Act are intended only to further these goals. Incontestability increases a producer's certainty that it will be able to retain the benefits of the good reputation it builds for itself, and thereby promotes the Lanham Act's fundamental goal of fostering competition. *Id.* (discussing relevant statutory history). The purpose of incontestability is to "provide a means for the registrant to quiet title in the ownership of his mark." *Id.* This property metaphor is a common one, with incontestability often being compared to adverse possession—both establish title through lack of opposition. The failure to contest ownership waives an attack on title to real property; it does not, however, create property in that which is not subject to ownership. By the same token, the fact that title in a trademark is quieted does not imply that the value of that title has somehow increased. If title to a trademark was useless at the

outset, as is title to a trademark in a functional feature, it remains so even if conclusively established.

### III

The well supported findings of the district court may be summarized to conclude that the appearance of the Shakespeare rod resulted solely from the natural appearance of materials assembled for the purpose of providing a lighter and stronger fishing rod. The invention was to attach a clear fiberglass tip to a hollow graphite base—with materials selected for their function and not appearance. Consistent with the natural appearance of the materials—fiberglass (a whitish translucence) and graphite (an opaque charcoal gray)—Shakespeare's trademark claims exclusive right to sell a rod that has a "whitish, translucent" tip and any "opaque" base. Thus, when Silstar manufactured a rod, assembling the same materials for the same functional purpose, Shakespeare brought suit even though Silstar left the materials in their original appearance and used the least expensive method of manufacture. It is uncontrovertible that this appearance is nothing more than a manifestation of the product's functional design, as found by the district court.

There are at least three different ways in which the two-tone appearance feature in which Shakespeare claims its trademark is functional: (1) it is uniquely effective in communicating to the public that high-quality materials, fiberglass and graphite, are included in the product; (2) it is the cheapest form in which the product may be produced (additional expense is involved in disguising the product's natural appearance, as the district court found as a fact); and (3) its appearance is the natural byproduct of a strong, light, and efficient design chosen for practical, not aesthetic, reasons. Each aspect alone would leave the appearance unprotectable. *See, e.g., W.T. Rogers Co. v. Keene,* 778 F.2d 334, 339 (7th Cir.1985) ("a functional feature is one which competitors would have to spend money not to copy but to design around...."); *Schwinn Bicycle Co. v. Ross Bicycles, Inc.,* 870 F.2d 1176, 1189 (7th Cir. 1989) (same); *Best Lock Corp. v. Schlage Lock Co.,* 413 F.2d 1195, 1199 (C.C.P.A.1969) ("It is settled law that a configuration of an article cannot be registered as a trademark if the purpose of the configuration is to contribute functional advantages to the article in which it is embodied or if the configuration results from functional considerations.")

The Court of Customs and Patent Appeals has decided a case analogous to this one, involving whether a design consisting of the even application of a reflective substance to the tips of fenceposts could constitute a trademark or was barred from such recognition by its functionality. While the applicant argued that other manufacturers could easily make use of this technology while distinguishing their posts by applying the reflective substance in a distinctive pattern (such as a spiral), this argument was soundly rejected:

> Here we have appellant's admission that reflective coating on the top of a fence post *is functional.*

> Here we have the ultimate contention that all appellant relies on for registrability in this case is the distinctiveness of its *"design."* The short answer is that there is no design. While the argument recites a number of possible *arbitrary* designs, appellant's own design is chimerical. The solicitor's brief contains a very practical answer to this argument, of which we approve, and which occurred to us independently, as follows:

> > In this case, a simple method of applying the functional reflective coating to the functionally designed metal post is to suspend the post top-downwards and dip it into the coating supply. This method of coating will inevitably produce the coating design shown in appellant's drawing. To permit appellant to assert trademark rights in its alleged mark would clearly have the effect of unjustifiably giving appellant a perpetual monopoly on the simplest and cheapest use of a simple process of applying a functional reflective coating to a functionally designed metal fence post.

*In re Pollak Steel Co.,* 314 F.2d 566, 570 (C.C.P.A.1963).

The majority opinion would not appear to take issue with the conclusion that Shakespeare's mark is functional. Indeed, it appears to embrace it, concluding only that functionality is not a statutory ground for *cancellation*. "Functionality is not one of such grounds [statutorily given for cancellation] and it may not be used as a basis for cancellation of a registration more than five years old." Majority at 1097.

## IV

The majority's focus on cancellation diverts attention to a non-determinative issue—whether the scope of the federal courts' power to cancel registrations is coterminous with that of the patent office. The federal courts are granted broad equitable powers over trademark registrations by 15 U.S.C. § 1119:

> In any action involving a registered mark the court may determine the right to registration, order the cancellation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action. Decrees and orders shall be certified by the court to the Commissioner, who shall make appropriate entry upon the records of the Patent and Trademark Office, and shall be controlled thereby.

The majority cites many authorities for the proposition that this authority granted the courts is concurrent with that of the patent office. This may well be true as a general matter, but the present case involves a claim that that office has attempted an act beyond its power and undertaken actions repugnant to federal policy as expressed by the Constitution and statutory enactments. None of the authorities cited deals with such a situation, rendering their broad statements dicta insofar as they are phrased to seem relevant to this very different situation.

That the federal courts, in enforcing a trademark, are allowed to assess independently whether that trademark is permissible as a matter of law seems to me to flow from the judicial power described in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). As important, the doctrine of functionality, which goes to the question of whether an enforceable trademark ever existed, was never rejected by the Lanham Act. On the contrary, it is tacitly embraced, and every court that has considered the doctrine has so assumed. To conclude otherwise would imply that Congress intended to alter the underlying constitutional policies of restricting monopolies on function to promote copying and competition.

Whether this court should order cancellation of the plaintiff's trademark on the grounds of functionality is a secondary, not a dispositive, question. Even if the registration is allowed to stand, that does not preclude us from denying enforcement of a mark when such enforcement would be repugnant to the policies embodied in this nation's laws. I would affirm the district court's judgment on the grounds that because of its functionality, Shakespeare's trademark cannot be enforced.

For the reasons given, I respectfully dissent.