**NOT RECOMMENDED FOR PUBLICATION**
File Name: 17a0091n.06
No. 15-4230

**FILED**
Feb 03, 2017
DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| NETJETS INC., et al., | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| INTELLIJET GROUP, LLC, dba IntelliJet | ) | DISTRICT OF OHIO |
| International, | ) | |
| | ) | OPINION |
| Defendant-Appellee. | ) | |
| | ) | |

BEFORE:     BOGGS, SUTTON, and STRANCH, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.**  NetJets Inc., a private aviation company, uses a software program called IntelliJet to run its aviation business.  NetJets brought claims for trademark infringement against IntelliJet Group, LLC, under the Lanham Act, 15 U.S.C. § 1051 et seq., and Ohio common law.  IntelliJet Group brought a counterclaim against NetJets, asserting that its use of the INTELLIJET mark was void *ab initio*.  The district court granted summary judgment to the defendant.  For the following reasons, we **REVERSE** in part and **AFFIRM** in part.

## I.     BACKGROUND

NetJets Inc. is a private aviation company that specializes in "fractional ownership" of private airplanes, aircraft-leasing services, private-jet services without ownership of the plane through charter services, private-plane-management services, and sale of used airplanes.  NetJets

transferred its intellectual property to Columbia Insurance Company, which in turn licenses NetJets to use and sublicense the intellectual property subject to Columbia's approval. We refer to the parties collectively as "NetJets."

In July 1995, NetJets's predecessor company developed a software program to "run [the company's] business," and named the program IntelliJet. Later that year, the company applied to register the trademark INTELLIJET with the United States Patent and Trademark Office (USPTO) in connection with the good of computer "software . . . for managing the business of aircraft leasing and sales." The application was approved and the USPTO issued Registration Certificate No. 2,025,410. NetJets continued to use and improve the IntelliJet software, developing a new and expanded version called IntelliJet II. In 2002, the company filed a "declaration of use and incontestability," stating that the mark was being used in commerce, pursuant to 15 U.S.C. §§ 1058 and 1065, which was accepted by the USPTO.

NetJets licensed the IntelliJet software to two external companies: National Private Air Transport Services Company Limited (NAS) and Marquis Jet Partners, Inc. NAS operated the NetJets Middle East program and licensed the IntelliJet software from 1998 through at least the end of 2009. Marquis Jet Partners was acquired by NetJets in 2010. According to NetJets, Marquis used the IntelliJet software prior to its acquisition and continues to do so today.

Within NetJets, the IntelliJet software is accessed remotely by NetJets employees in the United States and Europe. The company also uses the software to communicate with caterers and other vendors. In early 2013, NetJets debuted an "owner's portal," which allows customers to put their reservation requests directly into the IntelliJet software over the internet. The owner's portal is a publicly accessible webpage leading to a login screen, and features the INTELLIJET mark.

NetJets asserts that the IntelliJet software is a defining characteristic of NetJets in much of its advertising and the promotion of its services. For example, the record shows that IntelliJet is discussed on tours of the NetJets facility for customers and potential customers. NetJets has discussed the software by name in its own promotional literature, and the INTELLIJET mark has been mentioned in several trade press and general news sources as an identifiable aspect of NetJet's services.

Defendant-Appellee IntelliJet Group LLC was founded in 2005 and is primarily a broker for private jet services, or helping customers buy or sell an aircraft. IntelliJet Group offers referral services for aircraft management and leasing services, but does not perform these services itself. The company uses a sales-tracking software that it has referred to as "IntelliShit." At the time that IntelliJet Group was founded, its owner Gary Spivack settled on the name "IntelliJet" because he "thought it was a clever play on words." IntelliJet Group did an internet search of other jet aircraft brokers, business names in Florida, and a search of the USPTO website, to identify other uses of the "IntelliJet" name. The search of the USPTO website turned up several registrations of "IntelliJet," including NetJets's registration of the mark. Spivack determined that the mark was "specifically for a software package," and that "being in the industry," he knew the registered agent as "NetJets."

NetJets filed a lawsuit in January 2012, bringing four claims against IntelliJet Group: (1) trademark infringement under the Lanham Act, 15 U.S.C. § 1051 et seq., and under Ohio common law; (2) false designation of origin under the Lanham Act, 15 U.S.C. § 1125; (3) deceptive trade practices under Ohio Rev. Code § 4165.01 et seq., and (4) common-law unfair competition and injury to business reputation. IntelliJet Group answered and filed a counterclaim for cancellation of NetJets's trademark registration on the grounds that NetJets

abandoned it and that it was void *ab initio*. The district court granted summary judgment to IntelliJet Group on the Lanham Act claims, on its counterclaim for cancellation of the INTELLIJET registration on the ground of abandonment, and on the common-law trademark claim. This court reversed and remanded on the basis that there was a genuine issue of material fact regarding NetJets's uses of the INTELLIJET mark in commerce.

Upon remand, the district court granted summary judgment to IntelliJet Group on its counterclaim and NetJets's claims of trademark infringement. First, the district court determined that NetJets's mark was not incontestable under 15 U.S.C. § 1065, and thus IntelliJet Group was not limited to challenging the mark on the basis of the enumerated grounds in 15 U.S.C. § 1115(b). The district court then found that NetJets's mark was void *ab initio* because NetJets could not show that it was used in commerce at the time of its registration. The district court also determined that NetJets could not show that it had rights to the INTELLIJET mark as a service mark under the Lanham Act or Ohio common law. Finally, the district court also granted summary judgment to IntelliJet Group on NetJets's claims for trademark infringement and false designation of origin on the basis that there was no likelihood of confusion between the marks.

## II.    ANALYSIS

We review a district court's grant of summary judgment de novo and consider the facts and any inferences drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate when there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(a). The burden falls to the moving party to demonstrate that no genuine issues of material fact exist. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The central inquiry at the summary judgment stage is "whether the evidence presents a sufficient disagreement to require submission

to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

The Lanham Act defines a trademark as "any word, name, symbol, or device, or any combination thereof" that is used or intended to be used in commerce to "identify and distinguish . . . goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127. Trademark rights are established by the "bona fide use of a mark in the ordinary course of trade, and not made merely to reserve the right in a mark." *Id.*

Section 32 of the Lanham Act, 15 U.S.C. § 1114, allows trademark owners to enforce their rights for registered marks. The "touchstone of liability" in these claims is "whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997). A plaintiff can also show success in a false designation of origin claim based on whether the false designation creates a "likelihood of confusion." *Johnson v. Jones*, 149 F.3d 494, 502 (6th Cir. 1998). The same analysis applies for claims under Ohio common law of unfair competition and the Lanham Act. *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 626 n.2 (6th Cir. 2002).

### A. Void *Ab Initio* Cancellation

Under the Lanham Act, a mark may become incontestable if it is not successfully challenged within five years of its registration. *Daddy's Junky Music*, 109 F.3d at 282. The requirements for incontestable status are set forth under 15 U.S.C. § 1065. Section 1065(3) specifies one such requirement: that a registered mark be continuously used in commerce for "five consecutive years" subsequent to the date of such registration and is still in use in commerce, in order to be incontestable. 15 U.S.C. § 1065(3).

The statute provides that the registration of an incontestable trademark is "conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce." 15 U.S.C. § 1115(b). "Once incontestability is established, only [the] . . . defenses enumerated in § 1115(b) can be interposed in an action for trademark infringement." *Sovereign Order of Saint John of Jerusalem, Inc. v. Grady*, 119 F.3d 1236, 1240 (6th Cir. 1997). The "purpose of incontestability in federal trademark law is, quite simply, to avoid having the validity of trademarks litigated endlessly." *Id.*

IntelliJet Group brought a counterclaim to NetJets's trademark infringement claims, asserting that NetJets's use of the INTELLIJET mark is void *ab initio* because it was not used in commerce at the time of its registration. Void *ab initio*, or non-use at the time of registration, is not one of the defenses enumerated in § 1115(b). Nonetheless, the district court agreed with IntelliJet Group, determining that NetJets's mark never achieved incontestable status under § 1065 and, as a result, IntelliJet Group was not limited to the defenses under § 1115(b). The district court then granted summary judgment to IntelliJet Group on its counterclaim for cancellation of the mark.

In analyzing IntelliJet's counterclaim, we first turn to other requirements of the Lanham Act that limit challenges to registered marks.

### 1. Jurisdiction Under § 1064

To bring a challenge to NetJets's mark, IntelliJet Group must establish a valid ground for cancellation. Section 1064 of the Lanham Act limits the ability to challenge a mark that has been registered for five years. *See* 15 U.S.C. § 1064. Under § 1064(3), petitions for cancellation of a mark registered for five years may be brought only for a limited set of reasons, including fraudulent registration or if the mark has become generic. *Id.* Void *ab initio*, the basis of

IntelliJet Group's claims, is not one of these reasons and § 1064 bars its counterclaim for cancellation of the mark. The district court did not address the limits of § 1064 in its opinion, but simply moved from the conclusion that NetJets's mark was not incontestable to its conclusion that it was void *ab initio* because it was not used in commerce at the time of registration. This determination is incompatible with § 1064.

Two decisions from the Trademark Trial and Appeals Board are instructive. In *University of Kentucky v. Kentucky Gameday, LLC*, 2015 WL 9906634, at *2 (T.T.A.B. 2015), the Board rejected a void *ab initio* claim because the claim was "not enumerated under Trademark Act Sec. 14(3) [Section 1064(3)], and is not available against a registration which is more than five years old." *Id.* at *2. Because the registration of the mark in that case had occurred more than five years earlier, the Board struck the counterclaim as to the ground of non-use. *Id.* This determination relied in part on *Pennwalt Corp. v. Sentry Chemical Co.*, 219 U.S.P.Q. 542, 1983 WL 50161 (T.T.A.B. 1983), where the Board stated that there is "nothing in Section 14(c) which admits [non-use] as a ground for cancellation of a registration after five years have elapsed, unless the misstatement was with fraudulent intent." *Id.* at *9.

Similarly, in *Shakespeare Co. v. Silstar Corp. of America, Inc.*, 9 F.3d 1091, 1099 (4th Cir. 1993), the Fourth Circuit determined that the district court erred in cancelling a mark on the grounds of functionality because it was not an authorized ground for cancellation under § 1064. Though the Fourth Circuit's decision focused on functionality, not non-use at the time of registration, its analysis is instructive here. The court determined that "it would seem anomalous for Congress to enumerate specific grounds for cancellation for a five-year-old registration, as it has done in § 1064, and not list functionality, if it intended functionality to serve as such a ground." *Id.* at 1097. The power of federal courts to cancel a mark under the Lanham Act, as

provided for under § 1119, is subject to § 1064 and limited to the grounds listed in the statute. *Id.* at 1098 (citing J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 30.32[4] at 30-162 (3d ed. 1992)); *see also Park 'N Fly Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 203 (1985). We find this reasoning persuasive for analyzing a void *ab initio* challenge, which is also not enumerated in the statute.

We note that the Eleventh Circuit addressed a specific component of this issue in *Wilhelm Pudenz, GmbH v. Littlefuse Inc.*, 177 F.3d 1204, 1209-10 (11th Cir. 1999), and determined that § 1064 did not bar a challenge to a mark based on functionality, reasoning that the Supreme Court's decision in *Park 'N Fly* should not be extended to hold that "all non-enumerated defenses to incontestability were foreclosed." We find *Wilhelm* distinguishable. The Eleventh Circuit found that the language of § 1115(b), "read in the context of the entire Lanham Act and against the history of the functionality doctrine simply [did] not evince an intent to preclude functionality as a defense to incontestable registrations." *Id.* at 1210. Importantly, the court specifically referred to functionality as a "judicially created rule that predates the Lanham Act." *Id.* at 1207. Moreover, this decision followed a change to the law, as the court noted; subsequent amendments to the statute explicitly added functionality as an enumerated defense under § 1115(b), which further supported the court's determination that the amendments codified existing law and functionality had always been a recognized defense to an incontestable registration. Here, there have been no such subsequent changes to the statute adding non-use as a ground for cancellation under the Lanham Act that would support an inference that non-use is an existing, though unenumerated ground for cancellation. Nor has IntelliJet Group provided support for the contention that void *ab initio* challenges to registered marks predate the Lanham Act. In the absence of such evidence, we find that "the rationale [of] *Park 'N Fly* would [also]

apply so as to limit cancellation under § 1119 to the grounds set forth in § 1064." *Shakespeare*, 9 F.3d at 1097.

IntelliJet Group raises additional arguments that do not alter this conclusion. First, IntelliJet Group argues that § 1064 applies solely to a petition to cancel a trademark registration filed with the Trademark Trial and Appeal Board, and that § 1119 grants much broader power to federal courts overseeing cancellation proceedings. IntelliJet uses *Park 'N Fly* for support, positing that the language of § 1119 "give[s] . . . courts the broadest possible authority to determine the validity of trademark registrations." 469 U.S. at 213 (Stevens, J., dissenting). But IntelliJet Group quotes Justice Stevens's dissent for this proposition, not the majority opinion. To the contrary, the *Park 'N Fly* Court stated that "the power of the courts to cancel registrations and 'to otherwise rectify the register' must be subject to the specific provisions concerning incontestability." *Id.* at 203. This supports the Fourth Circuit's view that *Park 'N Fly* would apply to limit cancellation under § 1119 to the enumerated grounds listed in § 1064. *Shakespeare*, 9 F.3d at 1097. Moreover, treating a federal court's cancellation decision as qualitatively different from the TTAB's would be at odds with the Federal Circuit's determination that, where a defendant in an infringement proceeding fails to bring a cancellation counterclaim and loses the suit, the issue is precluded and the defendant cannot later seek cancellation from the TTAB. *Nasalok Coating Corp. v. Nylok Corp.*, 522 F.3d 1320, 1329 (Fed. Cir. 2008).

IntelliJet Group also argues that a registration that does not comply with the "use in commerce" requirement prior to the date of application is void *ab initio*—and therefore, the limits of § 1064 would not apply in the first place. It bases this argument on *Aycock Engineering, Inc. v. Airflite, Inc.*, 560 F.3d 1350 (Fed. Cir. 2009), where the Federal Circuit

determined that a plaintiff's mark was void *ab initio* because it had never been used to offer an air taxi service, as stated on the trademark application. The court then affirmed the TTAB's decision to cancel the mark. *Id.* at 1362 n.12. But the mark at issue in *Aycock* was listed on the Supplemental Register, not the Principal Register. Section 1064 only applies to the cancellation of marks, like NetJets's, that are listed on the Principal Register. Marks listed on the Supplemental Register, however, can be cancelled at any time for any reason. *See* 37 C.F.R. § 2.111(b). Finally, IntelliJet Group refers to *Procter & Gamble Co. v. Johnson & Johnson Inc.*, 485 F. Supp. 1185 (S.D.N.Y. 1979), to support its argument that non-use at the time of registration is always a valid ground for cancellation. But the court in that decision assumed that its power under § 1119 was limited by § 1064, and ordered cancellation because the defendants had made a sufficient showing under § 1064. *Id.* at 1211-12. Such a showing has not been made in the present case.

Section 1064 bars IntelliJet Group from bringing a claim that NetJets's mark is void *ab initio*. We therefore reverse the district court's grant of summary judgment to IntelliJet Group on its claim for cancellation of the mark.

### 2. Incontestability of the Mark

Using the statutory requirements of § 1065, the district court determined that NetJets's INTELLIJET mark was not incontestable because internal use of the software did not constitute use in commerce sufficient to satisfy the Lanham Act, and as a result, the registration was only prima facie evidence of the mark's validity. The court held that because the mark did not satisfy § 1065's requirements for incontestability, IntelliJet Group was not limited to challenges in § 1115(b) in seeking cancellation of the mark. Because we find that § 1064 bars IntelliJet Group from bringing its challenge to the mark as void *ab initio*, we decline to examine whether the mark is incontestable under § 1065 and whether the limitations of § 1115(b) apply.

**B.** **Common Law Service Mark Rights**

The district court determined that NetJets is not entitled to rights in INTELLIJET as a service mark under Ohio common law because the INTELLIJET mark is not a service mark, but rather applies to software as a good. NetJets argues that the mark has been used to identify and distinguish its private aviation services, and that its ownership rights in the mark "flow from the prior appropriation and use of the mark in the marketplace" rather than federal or state legislation. In support of this assertion, NetJets points to its use of the INTELLIJET mark in tours, in publicity for its software, and as "identifying the source and quality of NetJets' [aviation] services." But as the district court noted, the IntelliJet software is "the conduit *through which NetJets provides its services*," (R. 85 at PageID 4887) (emphasis added) not the service provided by NetJets itself. The "clear import of the [INTELLIJET] mark as used . . . is to identify the software or computer program which is used in the performance of the services." *In re Walker Research, Inc.*, 228 U.S.P.Q. 691, 692 (T.T.A.B. 1986). The record does not support a conclusion that IntelliJet software is itself a service rather than a tool used to assist in the provision of NetJets's aviation services. As a result, we affirm the district court's grant of summary judgment to IntelliJet Group on this claim.

**C.** **Likelihood of Confusion**

The district court also concluded that there was no likelihood of confusion in connection to the IntelliJet product and granted summary judgment to IntelliJet Group on NetJets's claims for common law trademark infringement and for false designation of origin under 15 U.S.C. § 1125.

In assessing whether there is a likelihood of confusion in a trademark claim, courts consider eight factors, known as the "*Frisch* factors." *See Frisch's Rest., Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1264 (6th Cir. 1985). The eight factors are:

> (1)     strength of the plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) defendant's intent in selecting the mark; (8) likelihood of expansion of the product lines.

*Id.* To create a genuine issue of fact, the plaintiff's "burden is to identify a disputed factor or set of factors whose resolution would necessarily be dispositive on the likelihood of confusion issue." *Abercrombie*, 280 F.3d at 646. The factors are meant to be "helpful guides rather than rigid requirements," with "[t]he ultimate question remain[ing] whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 509 (6th Cir. 2013) (alteration in original) (quoting *Daddy's Junky Music*, 109 F.3d at 280).

NetJet asserts that the district court erred by finding that there would be no likelihood of confusion based on only two *Frisch* factors. But "[t]he *Frisch* factors are . . . not always weighed consistently in this court's caselaw, and a particular factor might receive a greater or lesser weight depending on the circumstances." *Groeneveld*, 730 F.3d at 509. We have also "sometimes resolved the question of confusion by reference to only one or a few of these factors, without inquiring into the rest." *Id.*; *see also Abercrombie*, 280 F.3d at 646-47. Nonetheless, we briefly analyze the eight factors in our de novo review of NetJets's claims.

### 1.     Strength of the Mark

"The strength of a mark is a factual determination of [its] distinctiveness." *Frisch*, 759 F.2d at 1264. "The more distinct a mark, the more likely is the confusion resulting from its infringement," which in turn weighs in favor of its protection. *Id.* In addition to the "conceptual strength" of a mark's distinctiveness, courts also assess the "marketplace recognition value of the mark," or its "commercial strength." *Maker's Mark Distillery, Inc. v. Diageo N. Am. Inc.*, 679 F.3d 410, 419 (6th Cir. 2012). In assessing the strength of a mark, courts utilize four

categories of increasing strength, though they are not perfectly discrete: generic, descriptive, suggestive, and fanciful or arbitrary. *See Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1116-17 (6th Cir. 1996). The district court determined that the INTELLIJET mark is suggestive because it "suggests rather than describes an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception to determine the nature of the goods." (R. 105 at PageID 5467) (quoting *Champions Golf Club*, 78 F.3d at 1117). That is, INTELLIJET is a play on both "intelligent" and "jet" and suggests an intelligent software in relation to jets. The distinctiveness of this mark, however, is relatively weak, especially considering other federal registrations of the term and additional third party uses of the same or similar terms.

NetJets notes that a mark's incontestability status is relevant to the likelihood of confusion analysis because such status would support the strength of the mark. *See AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 794 (6th Cir. 2004) (stating that incontestable marks are "presumed to be strong marks"). But even if we were to determine that NetJets's mark is incontestable, this factor is not determinative. Instead, we must evaluate the strength of the mark in relation to the other *Frisch* factors and the light they shed on the likelihood of confusion.

### 2. Relatedness of the Goods

In assessing the relatedness of the goods, courts will consider three scenarios:

> (1) cases in which the services of the parties are in direct competition, "in which case confusion is likely if the marks are sufficiently similar"; (2) cases in which the "services are somewhat related but not competitive, so that likelihood of confusion may or may not result depending on other factors"; and (3) cases in which the "services are totally unrelated, in which case confusion is unlikely."

*Champions Golf Club,* 78 F.3d at 1118 (quoting *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1108 (6th Cir. 1997)). We agree with the district court's view

that NetJets's IntelliJet software and IntelliJet Group's aviation services are "related but . . . not directly competitive." Products are not "'related' . . . because they coexist in the same broad industry, but . . . if the services are marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by a common company." *Homeowners Grp.*, 931 F.2d at 1109.

The district court determined that because the dispute concerned NetJets's IntelliJet software and not NetJets's aviation services, there was no concern that buyers would find the parties' goods to be related. But the issue is not whether the goods will be confused with each other, but rather whether the public will be confused as to their source. *Recot, Inc. v. M.C. Becton*, 214 F.3d 1322, 1329 (Fed. Cir. 2000). NetJets argues that it uses the INTELLIJET mark for software that is used to perform various aspects of its private aviation operations, which are related to IntelliJet Group's aviation services. In support of its proposition, NetJets cites *Wynn Oil Co. v. Thomas*, 839 F.2d 1183 (6th Cir. 1988), and *In re Hyper Shoppes (Ohio), Inc.*, 837 F.2d 463 (Fed. Cir. 1988). But in *Wynn Oil*, we found that there was a likelihood of confusion between two car care product companies, where one sold bulk car wax for use in car washes and the other sold numerous car finishing products, including waxes. 839 F.2d at 1185, 1187. "Both products perform[ed] the same function—protecting the finish of cars," and the "difference [was] insignificant compared to the similarities which could easily lead a purchaser of the bulk wax to believe that it [was] buying a product affiliated" with the other company. *Id.* at 1187. This analysis is distinct from the issue here: *Wynn Oil* compared similar products offered by car care service companies, while NetJets asks us to compare its use of the IntelliJet software with IntelliJet Group's business as a whole. *In re Hyper Shoppes (Ohio)*, 837 F.2d at 464, where the Federal Circuit found relatedness between a trademark for furniture and general

merchandising services that included the sale of furniture, does not support NetJets's extension of the relatedness of the goods analysis, either. IntelliJet Group does not sell software that might be confused with NetJets's IntelliJet software. We agree with the district court's conclusion that this factor does not favor NetJets.

### 3. Similarity of the Marks

The "[s]imilarity of [the] marks is a factor of considerable weight." *Daddy's Junky Music*, 109 F.3d at 283. In assessing similarity, the court should analyze the "pronunciation, appearance, and verbal translation of conflicting marks." *Id.* Based on its analysis of the other *Frisch* factors, the district court determined that the similarity of the marks did not impact its ultimate conclusion that there was no likelihood of confusion. As NetJets points out, the parties use the INTELLIJET mark almost identically in "IntelliJet" software and "IntelliJet" private aviation services. Though their presentation varies, with IntelliJet Group using a stylized logo mimicking a plane, overall this factor favors NetJets.

### 4. Evidence of Actual Confusion

"Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion." *Wynn Oil*, 839 F.2d at 1188. Though "[d]ue to the difficulty of securing evidence of actual confusion, a lack of such evidence is rarely significant," we have also determined that isolated instances of actual confusion where the parties have co-existed in business in the same area for some time is also not conclusive or entitled to great weight in the determination. *Daddy's Junky Music*, 109 F.3d at 284; *see also Homeowners Grp.*, 931 F.2d at 1110. Nonetheless, NetJets has not produced any evidence of actual confusion between its use of the INTELLIJET mark and IntelliJet Group's. To the contrary, IntelliJet Group has provided testimony that no customer has asked to purchase the IntelliJet software, or asked if IntelliJet Group is connected with NetJets. Accordingly, this factor favors IntelliJet Group.

5.        Marketing Channels Used

This factor calls for the court to examine the "similarities or differences between the predominant customers of the parties' respective goods or services," and whether the "marketing approaches employed by each party resemble each other." *Daddy's Junky Music*, 109 F.3d at 285. This analysis necessarily entails a determination of the relevant markets for the goods or services, and whether they overlap in terms of the customers they target. *See Homeowners Grp.*, 931 F.2d at 1110 (noting that this factor is "significant in illuminating what actually happens in the marketplace" and is "of special importance" for this reason).

NetJets argues that this factor should weigh in its favor because both parties market their goods and services over the internet. But again, NetJets asks the court to look at its marketing efforts for its aviation services as a whole, rather than for the IntelliJet software specifically. The fact that both parties use the internet for marketing efforts does not overcome the differences between how the products are marketed, and that there is no evidence that NetJets markets its IntelliJet software as a standalone product. We find no basis for concluding that there is a likelihood of confusion based on the marketing channels used by the parties.

6.        Likely Degree of Purchaser Care

The sixth *Frisch* factor asks courts to assess how the "degree of care with which consumers likely purchase the parties' goods or services may affect the likelihood of confusion," taking into account whether a buyer is "sophisticated with respect to the purchase of the services at issue." *Daddy's Junky Music*, 109 F.3d at 285 (quoting *Homeowners Grp.*, 931 F.2d at 1111). The district court determined that because there was no indication that private-plane companies would seek to purchase the IntelliJet software in the future, it could not make a factual determination about the likely degree of sophistication of those purchasers. The record, however, shows that IntelliJet Group's private aviation sales and purchasing process requires a

high level of sophistication of its customers. For example, Spivack stated that IntelliJet utilizes an attorney for nearly every transaction made by the company.

NetJets does not dispute this characterization of IntelliJet Group's customers, but states that confusingly similar marks may lead even a careful and knowledgeable consumer to assume that a seller is affiliated with or identical to another party. *See Daddy's Junky Music*, 109 F.3d at 286). Nonetheless, "the ultimate significance of a given degree of care . . . depend[s] upon its relationship with the other seven factors." *Daddy's Junky Music*, 109 F.3d at 285. Without any evidence that NetJets markets its IntelliJet software to purchasers or leasers, any weight of this factor in NetJets's favor is weak.

### 7. Defendant's Intent in Selecting the Mark

The defendant's intent is "relevant because purposeful copying [of a mark] indicates that the alleged infringer . . . believes that his copying may divert some business from the senior user." *Id.* at 286. Direct evidence of intentional copying is unnecessary, but "the use of a contested mark with knowledge of the protected mark at issue can support a finding of intentional copying." *Id.*; *see also Wynn Oil*, 943 F.2d at 603.

The record shows that IntelliJet Group had knowledge of NetJets's federal trademark registration of the INTELLIJET mark at the time it selected its own name, based on a search for "IntelliJet" on the USPTO website. The record also reveals that IntelliJet Group referred to its own software as "IntelliShit," (R. 62-11 at PageID 3002) a name that plays on the IntelliJet moniker that NetJets uses for its software. But IntelliJet Group chose its name despite knowledge of *several* registrations for the "IntelliJet" mark, including NetJets's. There is no indication that IntelliJet Group chose the marks specifically to copy or compete with NetJets. Though the court may find that there are "sufficient facts to create an issue regarding whether the . . . defendant knew of plaintiff's marks and intentionally patterned the name of defendant after

them" even where the evidence supporting a finding of intentional copying is "slight," this factor must still be evaluated in light of the others. *Daddy's Junky Music*, 109 F.3d at 287.

### 8. Likelihood of Expansion

The final *Frisch* factor concerns the "'strong possibility' that either party will expand [its] business to compete with the other or be marketed to the same consumers," which will in turn "weigh in favor of finding that the present use is infringing." *Homeowners Grp*., 931 F.2d at 1112. An affirmative finding of likelihood of expansion "will provide a strong indication that the parties' simultaneous use of the marks is likely to lead to confusion, while a negative finding is *not* a strong indication to the contrary." *Champions Golf Club*, 78 F.3d at 1122.

NetJets argues that the record shows that IntelliJet Group intends to "compete against NetJets in areas beyond just the brokering of used aircraft, including chartering, leasing and aircraft management." But again, NetJets asks the court to compare its business as a whole with IntelliJet Group's aviation services. There is no indication from the record that NetJets intends to market its IntelliJet software separately, nor that IntelliJet Group intends to begin selling its own aviation software program. As a result, this factor weighs in favor of IntelliJet Group.

Based on our de novo review, we find that the *Frisch* factors do not suggest a likelihood of confusion between NetJets and IntelliJet Group in their use of the INTELLIJET mark. While some factors may weigh in NetJets's favor, such as the similarity of the marks or the defendant's intent in selecting the mark, we find that these factors are weak in light of the broader differences between the ways NetJets and IntelliJet Group utilize the mark. Rather, the realities of the marketplace suggest that the markets between NetJets and IntelliJet's products are so distinct, and the consumers so sophisticated, that there is no likelihood of confusion. Accordingly, we affirm the district court's grant of summary judgment to IntelliJet Group on NetJets's claims for trademark infringement and false designation of origin.

### III. CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's grant of summary judgment for IntelliJet Group on its counterclaim for cancellation of the mark as void *ab initio*, **AFFIRM** the district court's grant of summary judgment for IntelliJet Group on all other claims, and **REMAND** for the district court to address IntelliJet Group's argument that NetJets abandoned its mark through non-use.